UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ROBBINS & MYERS, INC.,                                    **DECISION**

                    Plaintiff,                        **and**

     v.                                                      **ORDER**

J.M. HUBER CORPORATION and                          **01-CV-201S(F)**
H. MILTON HOFF,

                    Defendants,
            Counter-Claimants and
               Third-Party Plaintiffs,

ROBBINS & MYERS ENERGY SYSTEMS, INC.,

               Third-Party Defendant.

APPEARANCES:                  THOMPSON, HINE LLP
                              Attorneys for Plaintiff and Third-Party Defendant
                              LESLIE W. JACOBS,
                              MATTHEW E. LIEBSON, of Counsel
                              3900 Key Center
                              127 Public Square
                              Cleveland, Ohio   44114-1291

                              HODGSON RUSS LLP
                              Attorneys for Plaintiff and Third-Party Defendant
                              ROBERT J. LANE, JR.,
                              JEFFREY C. STRAVINO, of Counsel
                              The Guaranty Building, Suite 100
                              140 Pearl Street
                              Buffalo, New York   14202-4040

                              DAY PITNEY, LLP
                              Attorneys for Defendants and Third-Party Plaintiffs
                              DENNIS R. LaFIURA,
                              PAUL R. MARINO,
                              DAVID S. SAGER, of Counsel
                              Post Office Box 1945
                              Morristown, New Jersey   07962-1945

                              PHILLIPS LYTLE LLP
                              Attorneys for Defendants and Third-Party Plaintiffs
                              EDWARD S. BLOOMBERG, of Counsel
                              3400 HSBC Center
                              Buffalo, New York   14203

## JURISDICTION

This action was referred to the undersigned by Hon. William M. Skretny on December 5, 2007 for determination of non-dispositive motions.  The matter is presently before the court on Defendants' and Third-Party Plaintiffs' J.M. Huber Corporation and H. Milton Hoff's motion to compel and for sanctions filed October 6, 2010 (Doc. No. 304) ("Defendants' motion").

## BACKGROUND

Defendants' motion was filed October 6, 2010, along with the Declaration of Paul R. Marino attaching exhibits A - M ("Marino Declaration") ("Marino Declaration Exh(s) ___") (Doc. No. 304) and Defendants' Memorandum in Support of Motion to Compel Discovery and for Sanctions (Doc. No. 304-1) ("Defendants' Memorandum").  On October 25, 2010, Robbins & Myers, Inc., and Third-Party Defendant Robbins & Myers Energy Systems, Inc. ("R&M" or "Plaintiff"), filed Plaintiff's Opposition of R&M to Defendants' October 6, 2010 Motion to Compel Discovery and For Sanctions (Doc. No. 311) ("Plaintiff's Opposition") and attaching Exhibit 1-21 ("Plaintiff's Exh(s) ___").  Defendants' Reply Memorandum in Support of Defendants' Motion was filed November 5, 2010 (Doc. No. 316) ("Defendants' Reply Memorandum").  Oral argument was conducted November 15, 2010 (Doc. No. 318).  At the court's request at oral argument, Plaintiff, on November 22, 2010, delivered to the court for *in camera* review, Plaintiff's Privilege Log, dated September 29, 2010, together with copies of 32 documents plus attachments as to which Plaintiff asserts an attorney-client privilege in opposition to Defendants' motion (Doc. No. 324) ("Plaintiff's Privilege Log" or "the Privilege Log").  At

the same time, Plaintiff also filed Plaintiff's Supplemental Memorandum in Further

Opposition to Defendants' Motion (Doc. No. 321) ("Plaintiff's Supplemental

Memorandum").  On the same date, Defendants filed Defendants' Memorandum in

Further Support of Defendants' Motion ("Defendants' Supplemental Memorandum")

(Doc. No. 320).  A transcript of the hearing was filed December 7, 2010 (Doc. No. 323)

("Hearing Tr. at ___").  Further oral argument was deemed unnecessary.


## FACTS[1]

Plaintiff, Robbins & Myers, Inc. ("R&M"), commenced this action on March 22,

2001, seeking to recover monetary damages, obtain a declaratory judgment and

recission based on Defendants' alleged fraud in connection with Plaintiff's 1997

purchase of Flow Central Equipment, Inc. ("FCE"), a wholly-owed subsidiary of

Defendant J.M. Huber Corporation ("Huber"), of which Defendant H. Milton Hoff ("Hoff")

was president (together, "Defendants").  Following its purchase, R&M changed FCE's

name to Robbins and Myers Energy Systems, Inc. ("R&MES").  On October 26, 2001,

Defendants commenced a third-party action against R&MES, Plaintiff's legal counsel

Thompson Hine, and Berkeley Forge and Tool, Inc. ("Berkeley Forge") (together, "Third

Party Defendants").[2]

Prior to Plaintiff's purchase of FCE in 1997, Plaintiff manufactured devices

known as closures, or caps, for use in the oil and natural gas transmission industry.

---

[1]  Taken from pleadings and papers filed in the matter.

[2]  Defendants' third-party claims against Thompson Hine and Berkeley Forge are not pertinent to the issues presented on Defendants' motion as these claims have been dismissed.  (Doc. Nos. 134, 148). R&MES remains a third-party defendant in this action.

Essentially, closures are metal mechanical devices that are attached to pipe systems that allow the flow or transmission of oil and natural gas in pipe systems under pressure.  The closures, or caps, facilitate the maintenance and operation of these oil and gas transmission systems.  The relevant closures in this case are designed to operate with both low and high pressure pipes which are either four or six inches in size.  It is undisputed that during the 1993-1996 period, Berkeley Forge provided steel forgings ("the Berkeley forgings") for Defendants' use in producing approximately 9,000 closures manufactured and sold by J.M. Huber to its customers and distributors.[3] Subsequently, in February 1996, Defendants discovered that the Berkeley forgings failed to meet certain quality (ANSI) standards and ceased selling the closures produced from the forgings.  Amended Complaint ¶ 10 (Doc. No. 95).  When the relevant closures were fabricated from the Berkeley forgings, FCE was a division of Huber, Amended Complaint ¶ 11; however, after discovering that the Berkeley forgings did not meet the ANSI standards required by Huber, FCE was spun off from Huber as a wholly-owned subsidiary, including its assets and liabilities.  *Id.* ¶¶ 10-11, 15. Thereafter, Plaintiff and Huber negotiated for a sale of FCE to Plaintiff that was completed in 1997.  *Id.* ¶ 35.

Plaintiff generally alleges that Defendants defrauded Plaintiff by failing to sufficiently inform Plaintiff prior to Plaintiff's acquisition of FCE of the extent of the metallurgical defects in problems with the Berkeley forgings and the consequently manufactured closures by Huber ("the closures" or "affected closures") such that

---

[3]  Huber also received forgings from another source not at issue in this case.

4

Plaintiff, following its acquisition of FCE, became liable for any potential for harm or actual harm to persons, property, or the environment in the event that any of the affected closures purchased by Defendants' customers, prior to Plaintiff's acquisition of FCE, used on their respective oil and gas supply pipelines, should fail as a result of the deviations in the metallurgical properties of the forgings and the closures which were manufactured by Defendants from such forgings.  Following Plaintiff's discovery of this problem with the closures (which the parties refer to as the "Off-Specification Closures"), Plaintiff attempted, in 2000, to recall 429 of the 4-inch high-pressure Off-Specification Closures, Defendants' Memorandum at 2 (citing Marino Declaration Exhs. C at 246; D at 126).

As a result of Defendants' motion for sanctions based on Plaintiff's violation of the court's prior order granting Defendants' motion to compel (Doc. No. 217), requesting the court reopen fact discovery, the court permitted a limited additional period of pretrial discovery to conclude 60 days following production of the documents at issue by Plaintiff  (December 1, 2009, Doc. No. 257).  Thereafter, on June 24, 2010 (Doc. No. 292), the court further extended discovery for an additional 90 days. Defendants, accordingly, on August 9, 2010, sought a further deposition of Plaintiff's representative pursuant to Fed.R.Civ.P. 30(b)(6) ("the Rule 30(b)(6) deposition) to supplement prior deposition testimony "based on recent occurrences or developments," and to provide information related to documents recently produced in compliance with prior orders of the court in connection with various discovery disputes resolved by the court.  Marino Declaration Exh. A (referencing documents produced by Plaintiff in compliance with Orders dated December 17, 2008, March 31, 2009 and January 7,

5

2010, Doc. Nos. 226, 233 and 266).

At the 30(b)(6) deposition conducted September 16, 2010, Joseph Rigot, Esq. ("Rigot"),[4] Plaintiff's designated witness, testified (Marino Declaration, Exh. E) (*passim*) about Plaintiff's decision to issue a so-called Public Service Announcement ("PSA") (Marino Declaration Exh. B).  In response to Defendants' questions, Rigot revealed that the subject of the need to inform Plaintiff's customers concerning the potential for performance problems or failures of the Off-Specification Closures, arising from the deficient quality of the Berkeley forgings, was discussed at a two-hour meeting conducted on February 10, 2010 at the office of Mr. Saeid Rahimian, Plaintiff's Chief Executive ("Rahimian"), initiated by Rahimian, at Plaintiff's Dayton, Ohio corporate offices.  Marino Declaration Exh. G at 19-20.  , who testified without any objection based on attorney-client privilege asserted by Plaintiff's attorney, Leslie W. Jacobs, Esq., who defended Rigot's deposition ("Jacobs"), the meeting's participants included Rahimian, Rigot, Lawrence Angelo ("Angelo"), an R&M lean vice-president, Kevin Brown ("Brown"), Plaintiff's Controller and Principal Accounting Officer, Linn Harson ("Harson"), Plaintiff's general counsel, and Jacobs, who is Plaintiff's principal attorney in this matter.  *Id.* at 20, 25. Chris Hicks, Plaintiff's Chief Financial Officer, may also have attended "parts" of the meeting.  *Id.* at 20.

According to Rigot, who also has been described as Plaintiff's general counsel, the meeting was called by Rahimian to discuss Rahimian's concern, as expressed to the participants, that because the affected closures that had not been previously

---

[4]  The deposition commenced September 15, 2010.  Marino Declaration Exh. E.

recalled by Plaintiff and had now been in service for a "longer" period of time, the closures "could present a higher level of risk than . . . when . . . first installed."  Marino Declaration, Exh. G at 19-20.  Rigot further stated that the participants at the meeting concluded that because of the "amount of time that has passed" in conducting the instant litigation to establish Defendants' liability for any damage caused by the defective closures and the fact that Defendants have failed to take any action with regard to the Off-Specification Closures, Plaintiff should notify its customers about possible failure of all of the Off-Specification Closures.  *Id.* at 22.  Rigot also stated that "various persons made comments about the situation," *id.* at 25, *i.e.*, the need for Plaintiff to inform its customers regarding Plaintiff's opinion of the potential increased risk of failure of the affected closures.  *Id.*  Rigot recalled that Angelo reported that since Plaintiff's 2000 recall of certain high-pressure closures, no "occurrences or accidents" involving the Off-Specification Closures remaining installed in customer pipe systems had been reported to Plaintiff.  *Id.* at 27.  Rigot agreed that the decision to issue the PSA was based on business considerations and not upon recent independent expert engineering opinions regarding increased risks associated with the closures.  *Id.* at 28-29.  Rigot could not recall that he, Harson, or Jacobs provided any legal advice during the meeting.  *Id.* at 34.  Rigot also stated that the initial draft of the PSA was prepared by Angelo and was circulated to the participants at the meeting for comment.  Marino Declaration Exh. E at 71.  Asked whether the participants reached any conclusions as a result of their discussion of Rahimian's concerns about the closures and the need to give notice to users, Rigot answered that

> the conclusion was that it would be appropriate, given the

> amount of time that has passed, and to the extent that
> apparently Huber has continued to do nothing about the
> closure products that they sold, that Robbins & Myers should
> make a substantial effort to put our customers on notice with
> respect to the unspecified closures [*sic*] that were sold.

Marino Declaration Exh. G at 22.

Rigot recalled that all participants concurred in this conclusion, *id.* at 22-23, and the

question whether the discussed closures had then become "dangerous," *id.*, at 23, was

not discussed; as such, Rigot explained that Rahimian thought Plaintiff "should do

something" to give "notice to customers with respect to closures [*sic*]," *id.* at 25,

because of the then "possibility that there could be a failure as time passed." *Id.* at 23.

Rigot further stated that he, along with Harson and Jacobs, as legal counsel to Plaintiff,

participated in the meeting at which the proposed PSA was discussed and that counsel

commented on the various drafts of the final PSA.  Marino Declaration Exh. E at 79.

The documents submitted with the Privilege Log include an outline of issues for

possible discussion at the meeting prepared by Jacobs (Privilege Log Doc. No. 1)

("Jacobs Outline"), Angelo's handwritten notes of the meeting's discussions (Privilege

Log Doc. No. 2) ("Angelo's notes"), and counsels' email comments and drafts of the

PSA and indicate such comments and drafts were also communicated to Michael

Chiles ("Chiles"), M. Day ("Day"), Rodney Hobbs ("Hobbs"), Michelle Kristoff ("Kristoff"),

Ashley Lusk ("Lusk") and Gene Sparkman, an R&MES vice president of closure sales

("Sparkman").  Privilege Log Doc. Nos. 3-7, 9, 20, 21, 24, 26, 28, 29, 31.

According to Rigot, Plaintiff believed that lower pressure, 300 lbs. per sq. inch,

Off-Specification closures, presented a lesser risk of failure than higher pressure Off-

Specification Closures, and so were not subject to any earlier recall program by

8

Plaintiff.  Marino Declaration Exh. E at 95.  Based on Rigot's earlier deposition of February 24, 2004 and May 1, 2008, Defendants state that Plaintiff previously attempted to recall only 429 Off-Specification Closures and had determined that the other Off-Specification Closures (6 inch diameter, 900-pound per sq. inch closures) not subject to the Plaintiff's 2000 recall were safe.  Marino Declaration Exhs. C at 233, D at 138.  In 2008, Rigot testified that Plaintiff was at that time not engaged in "actively recalling" any of the nearly 9,000 Off-Specification Closures then remaining installed in customer's facilities, Marino Declaration Exh. D at 122, but also asserted that it was Plaintiff's position that the longer a particular Off-Specification Closure remained installed "it probably has a greater propensity to fail."  *Id.* at 122.  Nevertheless, in 2000, Plaintiff, through its Canadian subsidiary located in Alberta, Canada, advised a provincial safety agency that lower pressure Off-Specification Closures manufactured by Defendants prior to the sale and purchase of FCE "pose no threat to safety," but that higher pressure closures "may be subject to failure."  Defendants' Reply Memorandum Exh. A.  Yet, alluding to all 9,000 remaining Off-Specification Closures, Plaintiff's PSA states unequivocally that such low pressure closures "have a potential safety issue requiring user attention," Marino Declaration, Exh. B at 1, and that because the closures were manufactured with "non-conforming steel" they "may be susceptible to failures which could result in serious safety and/or environmental hazards."  *Id.*  The PSA also directed the recipient's attention to the fact that the subject Off-Specification Closures were manufactured by Defendants prior to Plaintiff's purchase of FCE, and that Defendants "should accept responsibility for these manufacturing defects and recall the closures," but that Defendants "had taken no action to notify its customers of its use of

non-conforming material <u>or the risk posed</u> by these Huber products." *Id.* at 2 (underlining added).[5]

The PSA described how a user may accurately identify the Off-Specification Closures it may have currently installed in its pipe systems, recommended that inspections be conducted to detect potential failures in the closures, offered to provide guidance on such recommended actions through a customer assistance telephone number provided by Plaintiff, and, where necessary, to replace, without charge, any Off-Specification Closures with indicia of abnormal physical failure or degrading. *Id.* at 2. The PSA assigned to Defendants responsibility for Plaintiff's need to give notice to users of the Off-Specification Closures together with the primary obligation to replace the Off-Specification Closures informing the recipient of Defendants' failure to take remedial action and Plaintiff's decision to do so by issuing the PSA in lieu of any similar corrective action by Defendants. *Id.*

At Rigot's September 15, 2010 deposition, Rigot informed Defendants that the PSA had been sent to customers and users to whom Defendants had shipped Off-Specification Closures and that Plaintiff had also published the PSA in the *Pipeline & Gas Journal*, Marino Declaration Exh. E at 32, a national and highly regarded trade journal Plaintiff considered to be "the gold standard" of pipeline company "journals". *Id.* at 16.

In response to Defendants' question as to Plaintiff's prior communications with customers regarding potential risks arising from continued use of the closures, Rigot

---

[5] Unless indicated otherwise, all underlining is added.

further testified, without objection, that Plaintiff had for several years conducted so-called "lunch and learn seminars" with its customers "about the closure situation." Marino Declaration Exh. G at 30; Marino Declaration Exh. E at 32-33 ("lunch and learn 'sessions'"). While Rigot "believed" "the subject" of the PSA was discussed at such "lunch and learn 'sessions'," he was unable to state if any documents may have been distributed at these meetings or whether Plaintiff had records indicating where, when and with whom such sessions were conducted or the specific topics discussed by Plaintiff with the customer. Marino Declaration Exh. E at 32-33. Based on information he received from Sparkman, Rigot stated that the "lunch and learn seminars" included informing customers that the non-conforming closures "are more susceptible to failure." Marino Declaration Exh. E at 87-89.

When asked by Defendants why the PSA directed a reader's attention to Defendants' alleged failure to notify customers about the closures, Rigot was unable to answer. Marino Declaration Exh. E at 107 ("I don't know specifically the point [reason]").[6] However, Rigot was certain that modifications to the drafts of the PSA incorporated changes recommended by Plaintiff's attorneys. *Id.* at 107-08. Rigot was also able to summarize the five customer telephone call responses Plaintiff received in response to the PSA. *Id.* at 108.

According to Plaintiff, no documents related to the "lunch and learn seminars" or sessions have been located. Marino Declaration Exh. I, Letter to David S. Sager, Esq. from Matthew E. Liebson, Esq., dated October 1, 2010, ¶ 2. Plaintiff also contends that

---

[6] Unless indicated otherwise, all bracketed material is added.

Plaintiff requested and received legal advice during the course of drafting the PSA.  *Id.*

Plaintiff argues that Rigot's testimony regarding the "business" decision to notify

customers about the closure issue did not waive Plaintiff's attorney-client privilege as to

communications during the drafting of the PSA which involved Plaintiff's business

executives and corporate attorneys.  Plaintiff's Opposition at 8-10.  Plaintiff further

contends that contrary to Defendants' assertion, the subject of "lunch and learn"

sessions was described by Plaintiff in a 2003 deposition of Mr. Stephen L. Witte, Sr.

("Witte") (not further identified) and therefore additional discovery on this subject, as

Defendants request, Defendants' Memorandum at 10; Defendants' Reply Memorandum

at 4, 8; Defendants' Supplemental Memorandum at 9, is unnecessary.  Plaintiff's

Opposition at 3 (referencing Plaintiff's Exh. 3 at 213).

In a post-argument submission to the court, Sparkman averred that the "safety

guidelines for use of closures as well as maintenance and inspection procedures" were

the subject of "'lunch and learn'" sessions conducted by R&MES, Plaintiff's subsidiary,

before and after the PSA was published by Plaintiff.  Affidavit of Gene Sparkman (Doc.

No. 321-1), attached to Plaintiff's Supplemental Memorandum (Doc. No. 321)

("Sparkman Affidavit") ¶¶ 3-4.  Sparkman also stated that "[n]o documents relating

specifically to Off-Specification Closures have been created or used at 'lunch and learn'

sessions for closures or other products."  *Id.* ¶ 7.

## DISCUSSION

Defendants advance several grounds to support Defendants' request for

disclosure of the documents referenced in Plaintiff's Privilege Log and for sanctions,

12

including additional discovery related to the PSA, the costs of conducting such discovery and for attorneys fees incurred by Defendants in connection with Defendants' motion.  At the outset, Defendants argue that Plaintiff has failed to supplement, as required by Fed.R.Civ.P. 26(e)(1)(A) ("Rule 26(e)"), its responses served in response to Defendants' Third Document Request, dated March 7, 2008 (Marino Declaration Exh. H).  Specifically, Defendants contend that Plaintiff was obligated to supplement its responses to Defendants' Requests Nos. 13 and 14 which requested, respectively, documents pertinent to Plaintiff's investigation and recall of Off-Specification Closures (Request No. 13) and Plaintiff's communication with shareholders and customers "concerning the safety of Off-Specification Closures"  (Request No. 14) ("Defendants' Requests"). *Id.*  Defendants contend that Plaintiff failed to comply with Rule 26(e) in not providing information regarding preparation and publication of the PSA, Plaintiff's follow-up telephonic communications with recipients of the PSA, and "lunch and learn seminars" regarding Plaintiff's supposed safety concerns about the closures that occurred following publication of the PSA on March 1, 2010 and prior to Rigot's September 15-16, 2010 deposition.  Defendants' Memorandum at 5; Defendants' Reply at 2-5.  Although Plaintiff produced, following the Rigot deposition, on September 29, 2010, its Yale Closure Recall Questions and Responses, Marino Declaration Exh. M ("Q&R"), to guide Plaintiff's representatives in answering customers' questions in response to the PSA, Defendants maintain such production failed to address the data on which the Q&R was based, to whom it was distributed or how it was used by Plaintiff.  Defendants' Memorandum at 6; Defendants' Reply at 4, (¶ 3).  Defendants also contend that Rigot's testimony regarding the so-called "lunch and learn seminars"

as they relate to the Off-Specification Closures is misleading in that Rigot had failed to state in his prior depositions that Plaintiff had utilized such customer contacts as a means to specifically address Plaintiff's belief that the 9,000 Off-Specification Closures, not recalled by Plaintiff in 2000, remained a serious risk to safety despite Plaintiff's public pronouncement to a Canadian provincial agency to the contrary.  *Id.* at 5.  As Defendants are highly skeptical that Plaintiff has produced all documents within the scope of the duty to supplement under Rule 26(e) regarding these matters, Defendants' Memorandum at 6, Defendants request further discovery related to the substantive basis of Plaintiff's opinion regarding the risk of failure of the affected closures at this time, as well as to Rigot's credibility.  *Id.*

Second, Defendants argue that Plaintiff has waived any potential attorney-client privilege in the 31 documents enumerated in the Privilege Log along with the attachments which have been submitted to the court for *in camera* review because none was timely asserted as privileged during the course of Rigot's deposition testimony and that Plaintiff, through Rigot's testimony regarding the meeting and the substance of the discussions, has effected a subject matter-waiver of the privilege applicable to all of Plaintiff's withheld documents relating to the subject of the meeting, specifically the need for and the preparation of the PSA. Defendants' Reply at 6-9. Defendants also contend that the failure to provide a timely privilege log, as required by Fed.R.Civ.P. 26(b)(5)(A), prior to Rigot's disclosure, also waived any potential privilege, *id.* at 10, and as Plaintiff's service of such log on September 29, 2010 was untimely, such failure constituted a waiver of any attorney-client privilege that might apply to the

withheld documents.  Defendants' Memorandum at 8.[7]

Third, Defendants contend that Rigot's deposition testimony was "incomplete" in several respects, relevant to the issues in this case, as regards the particulars of the discussion during Plaintiff's February 10, 2010 meeting ("the February 10, 2010 meeting," or "the meeting")[8] at which the subject of the PSA, its content, and the manner of its publication were discussed and approved.  Defendants' Reply at 8; Defendants' Memorandum at 10-11.  Specifically, Defendants cite, as relevant to Plaintiff's materiality and damage claims, and its request for declaratory relief, Rigot's inability to provide specific information as to "lunch and learn" sessions with Plaintiff's distributors and customers regarding the affected closures, Defendants' Memorandum at 10; Defendants' Supplemental Memorandum at 4-5, Plaintiff's communication, if any, with its insurance carrier regarding its decision to issue the PSA, responses received from Plaintiff's customers and users of the Off-Specification closures, and how Plaintiff determined the recipients of the PSA.  *Id.*  Defendants' Memorandum at 10-11; Defendants' Reply at 8-9; Defendants' Supplemental Memorandum at 4-5.  Defendants therefore requested the court permit additional discovery to include further depositions of a representative of Plaintiff with knowledge of these matters, particularly Ms. Lisa Lee ("Lee") who was responsible for handling Plaintiff's customer hot-line to respond to

---

[7] While not specifically addressed in Defendants' motion papers, at oral argument, Defendants also contend that given the business nature of the discussions at Plaintiff's February 10, 2010 meeting and subsequent email communications related to the drafting of the PSA, none of the discussions or communications were privileged.  In particular, Defendants contend that if, as Plaintiff stated at oral argument, the February 2010 meeting was a "business meeting," Defendants' Supplemental Memorandum at 7, and thus the discussions were not privileged, all subsequent documents relating to the subject-matter of the meeting are similarly not privileged.  *Id.* at 7.

[8] The exact date of the meeting does not appear in either Defendants' motion papers or Plaintiff's opposition papers but is revealed in the documents attached to the Privilege Log.

customer questions regarding the PSA and Q&R, Plaintiff's Opposition at 11-12;

Defendants' Memorandum at 11, and Sparkman as to relevant details regarding

Plaintiff's conduct of the "lunch and learn seminars" as utilized by Plaintiff to

communicate the risks Plaintiff associates with the Off-Specification Closures with

Plaintiff's customers and others.  Defendants' Reply at 9.

Finally, Defendants request that the court impose sanctions on Plaintiff based on

Plaintiff's violations of Plaintiff's duty to supplement the responses to Defendants'

Requests, including striking the Amended Complaint or awarding Defendants the

expenses of Defendants' motion and the conduct of the further depositions requested

by Defendants.  Defendants' Reply at 9-10.

In opposition, Plaintiff makes several arguments.  First, Plaintiff contends that its

decision to issue, in 2010, the PSA does not constitute prejudicial surprise to

Defendants as Plaintiff has throughout this litigation alleged that all the Off-Specification

Closures, including the low-pressure closures not previously subject to formal recall by

Plaintiff, manufactured by Defendants prior to the 1997 FCE sale to Plaintiff, created

safety risks which would increase over time, and that Plaintiff's decision to issue the

PSA was consistent with Plaintiff's stated position.  Plaintiff's Opposition at 1.  Second,

Plaintiff asserts the existence of Plaintiff's use of "lunch and learn seminars" to

communicate safety information, as described by Rigot and the Sparkman Affidavit,

was first revealed in Witte's 2003 deposition and therefore provides no basis to find

these facts were subject to a duty to supplement pursuant to Rule 26(e) warranting

further depositions on this subject.  *Id.* at 3.  Third, Plaintiff argues that, in any event,

Rule 26(e) imposes no duty to supplement for documents such as the PSA and related

drafting documents, created after a party's response, *id.* at 5-6, because the duty applies only to subsequently discovered documents existing at the time responses were served that render the party's prior disclosure or response materially incomplete or incorrect when made.  *Id.* at 6.  Moreover, according to Plaintiff, no supplemental production need be directed as Plaintiff has produced the PSA, and has also produced, or asserted as privileged, documents related to the drafting of the PSA, Plaintiff's mailing list for the PSA, logs of Plaintiff's telephone hot-line customer responses to the PSA and related materials, *i.e.*, the Q&R, and invoices for production of the PSA as evidence relevant to Plaintiff's claims for damages, thereby rendering Defendants' motion moot.  *Id.* at 5, 8.

Plaintiff also maintained at oral argument that because the February 10, 2010 meeting was for business, not legal purposes, *i.e.*, to obtain legal advice or services, Rigot's testimony at the Rule 30(b)(6) deposition regarding the purpose and general discussions of the purpose and results of the meeting does not create a subject-matter waiver of what Plaintiff asserts as otherwise privileged communications between Plaintiff and its attorneys who provided a memorandum to guide discussions at the meeting and comments via email messages on the series of drafts of the PSA initially prepared by Angelo, starting February 16, 2010, six days after the meeting, culminating in a final version published by Plaintiff on March 1, 2010 Plaintiff's Opposition at 9-10; Plaintiff's Supplemental Memorandum at ("Plaintiff's "decision . . . whether or not to issue a public safety announcement was not itself privileged," "the mere presence of counsel in a meeting or counsel's participation in a communication does not render that communication or meeting 'privileged.'")  *Id.* at 4.  Because Rigot gave no testimony as

to the process of drafting the final version of the PSA or the preliminary memorandum

prepared by Jacobs, Plaintiff maintains no subject-matter waiver occurred as to these

subsequent drafts and related comments by Plaintiff's executives and attorneys,

including Jacobs.  *Id.* at 10 (citing caselaw); Plaintiff's Supplemental Memorandum at 4-

5.  Plaintiff also argues because of Plaintiff's recent document production following

Rigot's deposition Defendants have failed to justify their request for a further Rule

30(b)(6) deposition of Plaintiff, as well as depositions of Lee as to the Q&R information

and its use by Plaintiff, and Sparkman, regarding Plaintiff's use of "lunch and learn

seminars" on the safety of the Off-Specification Closures.  *Id.* at 12.


**A.    Plaintiff's Duty fo Supplement**.

Defendants' motion is based on Defendants' Third Request for Documents dated

March 7, 2008, specifically, Requests Nos. 13 and 14.  Marino Declaration Exh. H at 7.

As relevant, Request No. 13 directed Plaintiff provide [a]ll documents created,

distributed or sent by Plaintiff since January 1, 2004 "reflecting, referring, or relating to

R&M's investigation, recall, or decision not to investigate or recall Off-Specification

Closures."  Request No. 14 sought from Plaintiff all documents "reflecting, referring, or

relating to communications to . . . customers of R&M concerning the safety of Off-

Specification Closures, Off-Specification 6" Closures, Off-Specification 4" Closures,

Closures, or Closure Products."  *Id.*  Although the parties have not provided copies of

Plaintiff's responses to the Defendants' Document Requests, in its  opposition to

Defendants' motion Plaintiff argues whether Defendants' contention that pursuant to

Rule 26(e) Plaintiff was under a duty to supplement Plaintiff's responses is correct, the

issue is moot because Plaintiff "has produced all documents responsive to [Defendants'] new requests."  Plaintiff's Opposition at 5 (underlining in original).  While some documents relating to the PSA created by Plaintiff after Plaintiff served its responses to Defendants' Requests have been recently provided to Defendants, that they were not provided "in a timely manner," Fed.R.Civ.P. 26(e)(1)(A), after they were created during February 2010 by Plaintiff and following publication of the PSA on March 1, 2010, is not disputed by Plaintiff.  Moreover, as the "lunch and learn seminars" had, according to Rigot's deposition, taken place on a regular basis prior to 2008 and following issuance of the PSA, and requested related documents responsive to Defendants' Requests were not produced at that time, the question of whether Plaintiff was under a duty to supplement prior to Defendants' motion, and the resulting need for additional discovery and sanctions, attributable to Plaintiff's failure to supplement timely, is not moot.  However, as according to Sparkman, no responsive documents for use by Plaintiff at the "lunch and learn seminars" were "created or used" by Plaintiff "for closures . . .,"  Sparkman Affidavit ¶ 7, the court need not address Defendants' motion as it pertains to documents created in connection with such "lunch and learn seminars."  Plaintiff does not contest Defendants' motion seeks information relevant to the claims or defenses in this case; rather, Plaintiff contends Defendants seek information not relevant to "prior discovery requests," because of the information provided by Rigot in his September 2010 deposition.  Plaintiff's Opposition at 7.  However, this contention ignores the question whether Plaintiff had a duty to supplement with information responsive to Defendants' Requests.

Thus, if Plaintiff was required to supplement timely Plaintiff's responses to

Defendants' Requests following creation by Plaintiff of the documents at issue in connection with the discussions at the February 10, 2010 meeting, the subsequent preparation and dissemination of the PSA on March 1, 2010, customers or user responses to the PSA, and communications on the subject of the PSA during subsequent "lunch and learn seminars" conducted by Plaintiff, prior to the September 2010 Rigot Deposition, the issues raised by Defendants' motion are not rendered moot by Plaintiff's later production as a failure to comply timely with Rule 26(e) may subject a party to sanctions pursuant to Fed.R.Civ.P. 37(c)(1) including the need to reopen discovery and assess the related expenses upon Plaintiff as Defendants request.  "A party's failure to supplement an earlier discovery response is sanctionable under Rule 37(c)."  Patrick E. Higginbotham, 6-26 MOORE'S FEDERAL PRACTICE - CIVIL § 26.132. (2010 Matthew Bender & Company, Inc.) (citing caselaw).  The court therefore turns to whether Plaintiff was required to supplement timely their responses to Defendants' Requests by providing the documents relating to Plaintiff's decision to issue the PSA including the drafting and publication of the PSA, pursuant to Fed.R.Civ.P. 26(e) and subsequent related communications with Plaintiff's customers and users regarding the PSA and the affected closures, although created after Plaintiff's responses in 2008.

Plaintiff primarily bases its argument that Rule 26(e)(1) is inapplicable to documents created by a responding party on its assertion that the 1970 Revisers' Notes to Rule 26(e) support Plaintiff's limited construction of the rule.  Specifically, Plaintiff points out that the Revisers' Note to the 1970 Amendment of Rule 26(e) states that "Subdivision (e) provides that a party is <u>not</u> under a continuing burden [to supplement] except as expressly provided."  Plaintiff's Opposition at 5 (underlining added by

20

Plaintiff).  According to Plaintiff, "[t]here was no subsequent change in the pertinent provision before 2007."  *Id.*  Plaintiff also asserts that the Revisers' Notes to the 2007 amendment to Rule 26(e) "reflect a change of language to recognize 'the duty to supplement or correct by providing information that was not originally provided <u>although it was available at the time of the initial disclosure or response</u>,'" thus indicating there is no duty to supplement as to later created documents such as, in this case, the PSA and related documents, *i.e.*, no duty regarding "a subsequent event".  *Id.* at 5 -6.[9]  Plaintiff therefore concludes that ". . . unless there is a contrary local rule or court order, supplementation is required only to correct a prior error or omission, not as a substitute for new discovery on a subsequent event."  *Id.* at 5-6.  Plaintiff's analysis of the scope of Rule 26(e)'s duty to supplement is incorrect.

In 1970, Rule 26(e) was added to the Federal Rules of Procedure based on the opinion of the Advisory Committee that requiring a responding party to supplement discovery responses based on "<u>new</u> information [which] renders substantially incomplete or inaccurate an answer [or response] which was complete and accurate when made," would place a "continuing burden" on the responding party, the difficulty of which would require attorneys to "canvass all new information" and "recheck" a party's prior discovery responses.  Appendix to Fed. Rules Civ. Proc., Rule 26, 28 U.S.C. App., at 7782.  As adopted in 1970, Rule 26(e) provided that a party who had provided discovery responses that were "<u>complete when made</u>," was "under <u>no</u> duty to supplement" the response "to include <u>information</u>, <u>thereafter</u> <u>acquired</u>," except as to the

---

[9]  Underlining supplied by Plaintiff.

identity of witnesses, including experts and their expected testimony, or if the newly acquired information establishes that the prior response was "incorrect when made," or if the response was correct when made it is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment," *id.*, or upon court order or agreement of the parties.  *Id.*  Thus, contrary to Plaintiff's assertion, the 1970 version of Rule 26(e) expressly required supplementation when an original response was "no longer true," the responding party became aware of that fact, and a failure to supplement would constitute "a knowing concealment."  *Id*.

In 1993, Rule 26(e) was amended, as relevant, to provide that a party was under a duty to supplement its responses to a prior request for production to include "information thereafter acquired, if ordered by a court, or  "seasonably" "if the party learns that the response is in some material respect incomplete or incorrect," and if the additional or corrective information has not otherwise been provided to the requesting party.  Title 28, Appendix-Rules of Civil Procedure at 708.  The Advisory Committee comment to the 1993 amendment stated that "[t]he obligation to supplement . . . applies whenever a party learns that its prior . . . responses are in some material respect incomplete or inaccurate."  *Id*. at 722.  The 2000 and 2006 Amendments to Rule 26 effected no change to Rule 26(e).  Title 28, Appendix Rules of Civil Procedure at 716 (2000); 157 (2006).

Rule 26(e) was further amended in 2007 to effect stylistic, but not substantive changes.  Reviser's Note ¶ 1 ("Those changes are intended to be stylistic only.").  Thus, as amended and applicable to this case, the rule now provides that a party has a duty to supplement "in a timely manner" when a "party learns" that its prior response "is

22

incomplete or incorrect" "in some material respect" and "the additional or corrective

information has not otherwise been made known to the other parties," or "in writing,"

Fed.R.Civ.P. 26(e)(A), or by court order, Fed.R.Civ.P. 26(e)(B).

The Revisers' Notes to the 2007 Amendment observed that the requirement to

supplement based on "information thereafter acquired" under the 1993 amendment to

Rule 26(e) was an "apparent limit," one "not reflected in practice," as parties understood

the duty to supplement included "information that was not originally provided although it

was available at the time of the . . . response."  Revisers' Note 2007 Amendment ¶ 6.

Accordingly, the phrase "information thereafter acquired" was deleted as a desirable

"stylistic" change in order "to reflect the actual meaning of the present rule."  That

meaning has been unambiguously declared as follows

> The 2007 restyling amendment to Rule 26 recognizes the
> duty to supplement or correct a disclosure or response with
> information that is thereafter acquired, as well as information
> that was not originally provided even though it was available
> at the time of the prior disclosure.

6-26 MOORE'S FEDERAL PRACTICE – CIVIL § 26.131 (3d ed. 2010).  Information thereafter

acquired by a party cannot exclude documents subsequently created by a party, as by

creating the document the party most certainly has thereby "acquired" information which

it reasonably should know, *i.e.*, "learns," has rendered its prior response materially

inaccurate or incomplete.

Thus, as adopted in 1970, Rule 26(e) provided that a party was under a duty to

supplement its discovery responses based on information acquired after the response if

the later acquired information by a party rendered the party's original response no

longer true, and a failure to provide the after acquired information amounted to an

intentional, *i.e.*, "knowing," concealment.  Title 28, Appendix - Rules of Civil Procedure at 7775.  Far from exempting a party from a duty to provide supplemental information coming to a party's attention after a discovery response is served which altered the completeness or correctness of its earlier response, Rule 26(e) imposed a duty to supplement where, because of the nature of the information, the party actually became aware of the information as well as the materiality of non-disclosure.

The language of the 1993 amendment referring to the requirement to supplement with information acquired by a party after a party's initial response was not, as Plaintiff contends, Plaintiff's Opposition at 5, removed by the 2007 stylistic amendment to exclude documents created after service of a response as the amendment was not intended to effectuate a substantive change to the purpose and scope of the duty to supplement under Rule 26(e).  Rather, the 2007 amendment was, according to the Revisers' Note ¶ 6 intended only to eliminate any potential misreading that would restrict the supplementation duty to later acquired information in contrast to information which was available to the party prior to service of the response but not then disclosed.  As the May 23, 2006 minutes of the Civil Rules Advisory Committee in considering the change effected in the 2007 amendment to Rule 26(e) stated

> All reference to "thereafter acquired" was deleted from the Style [proposed] Rule because this limit was thought to have disappeared from actual practice.  All lawyers understand that there is an obligation to supplement or correct a disclosure or response no matter whether the omitted information was known at the time of the initial disclosure or response or whether in some sense the party "learned" of the information "later acquired."

Civil Rules Advisory Committee of the Judicial Conference, 2006 WL 2940679, *10

(J.C.U.S).

Significantly, this comment makes no distinction between a document that existed before service of a response to an earlier request or that was created at a later time, *i.e.*, as "information thereafter acquired," once the party learns of the existence of the responsive information.  As of 1993, the duty of supplementation under Rule 26(e) was therefore triggered based on the responding party's awareness that providing new information even if later acquired by the party to its adversary was necessary to support the adversary's continuing reliance on the accuracy of an earlier response when new information of which the party gains knowledge renders the prior response materially incorrect or incomplete.  Title 28, Appendix – Rules of Civil Procedure at 708.

Thus, the statement in the 2007 Reviser's Note explaining the rationale for deletion of the phrase "to include information thereafter acquired," does not denote any intention to restrict the duty of supplementation to information available but not provided at the time of the disclosure or response; rather, the duty to supplement applies to any information, whether it existed and was available at such time or was later created and became available or known to a party only after service of the response, necessary to render the disclosure or response materially complete or accurate regardless of when the information was acquired, *i.e.*, when the responding party "learns" of the information.  Significantly, in the instant case, there is nothing in the record that suggests Plaintiff's lawyers were not aware of the creation and existence of the PSA and related documents in March 2010, as they admittedly participated in the decision to issue the PSA, in formulating the general substance of its content and its subsequent drafting and publication. The undisputed facts in the instant case therefore establish

25

that Plaintiff, by the time the PSA was issued on March 1, 2010, had, "in some sense," learned of the later acquired or created information relevant to Defendants' Requests.

Moreover, Rule 26(e) imposes the duty on not only "corrective" but "additional information" requiring the court give effect to the term "'additional'" as used in the text of the rule. *See Perez v. Westchester County Department of Corrections*, 587 F.3d 143, 155 (2d Cir. 2009) ("[w]e construe statutes to avoid surplusage whenever possible," (citing *California Public Employees' Retirement System v. WorldCom, Inc.*, 368 F.3d 86, 106 (2d. Cir. 2004) ("statutes should be construed, if possible, to give effect to every clause and word."))). A standard definition of "additional" includes anything added or further to something that exists. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 24. The scope of the term "additional" is therefore not limited to documents existing prior to a response; rather, the term broadly applies to any piece of "additional" information without reference to the date of its existence.

Plaintiff's argument, that documents later created by Plaintiff otherwise responsive to Defendants' Document Requests, such as the PSA and the other documents at issue on Defendants' motion, are not within the supplementation duty under Rule 26(e), is therefore contrary to the history and text of Rule 26(e). Consistent with its initial formulation in 1970, this duty has since 1993 unambiguously attached to relevant and material "information" whenever a party "learns" it should be provided to an adversary to render an earlier response not materially incomplete or incorrect. See Fed.R.Civ.P. 26(e)(1)(A).

To suggest, as Plaintiff's contention implies, that a party which has stated in an earlier response that no responsive document then exists but who, for example, the

next day creates such a responsive document has not thereby learned of the existence

of the responsive document by the very act of its creation is contrary to the express

language of Rule 26(e) and its intent.  Simply, a party which responds to a request that

no responsive document exists, or that the only responsive documents are those

described in the response, and then at a later time creates another responsive

document which the party then knows, or reasonably should know, is materially within

the scope of the earlier request most certainly "learns" of the existence of the document

thereby triggering the duty to timely serve a supplemental response bringing the fact of

its creation and existence to the attention of the adversary party.  To argue otherwise

would effectively defeat the long-standing salutary purpose of Rule 26(e) as established

when first enacted in 1970 and as consistently understood and intended by its drafters

in the course of the rule's several revisions over its forty-year history.  *See Gary Plastic*

*Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 236 (2d

Cir. 1985) (federal discovery rules to be "interpreted broadly").  Additionally, such a

construction could create an unfair barrier to discovery where the later creation of a

responsive document occurs after a discovery cut-off date imposed under a scheduling

order entered pursuant to Fed.R.Civ.P. 16(b) leaving the adversary party potentially

without an opportunity to serve a formal request for supplementation while insulating

the responding party from the responsibility to provide supplementation.

It is, of course, true that in protracted and complex litigation the generation of

new and responsive documents could conceivably impose unfair supplementation

burdens on a responding party and its attorneys, as the 1970 Revisers Comment noted,

which should not fall within a general duty to supplement absent a specific followup

request for supplementation, or if directed by the court.  But that potential burden was addressed in the 1970 structure of Rule 26(e) and the 1993 amendment by imposing a requirement upon the responding party covering both knowledge of the new information, whether by subsequent discovery of its prior existence or its later creation, as well as a showing of the materiality of the subject information.  Where these two criteria are satisfied, the risk that a party will be burdened or sanctioned unfairly for violation of the duty to supplement based on the advent of relevant and material information unknown to the party at the time of its initial response or because of its later creation is greatly reduced if not eliminated.

Additionally, in this case, because the PSA and related documents are well-within the scope of Defendants' Requests and relate directly to the question of whether Plaintiff has, since purchasing FCE, consistently treated as material, Defendants' alleged omissions and misrepresentations regarding the Off-Specification Closures, as well as Plaintiff's related damages based on Defendants' fraud, the documents represent a material degree of incorrectness and incompleteness contrasted to Plaintiff's earlier responses to Defendants' Requests, and Plaintiff does not contend otherwise.  "Information is 'incomplete or incorrect' in 'some material respect' if there is an objectively reasonable likelihood that the additional or corrective information could substantially affect or alter the opposing party's discovery plan or trial preparation." *Sender v. Mann*, 225 F.R.D. 645 (D.Colo. 2004) (quoting Rule 26(e)).  Here, Plaintiff has stated that if the full extent of Defendants' sale of the Off-Specification Closures becomes known to users and distributors of the closures, consumer confidence in Plaintiff's products "will be compromised, and competitors will obtain leverage to attack

RMES distribution channels and user markets."  Defendants' Supplemental

Memorandum at 3 (citing and quoting Doc. No. 316-1, Defendants' Reply Memorandum

in Support of Defendants' Motion to Compel, Exh. B, Plaintiff's Answer to Interrogatory

No. 8 of Defendants' Second Set of Interrogatories).  In addition, Defendants could

reasonably have relied upon Plaintiff's 2000 public representation to Canadian

authorities that the unrecalled closures posed no risk, Facts, *supra*, at 9, in formulating

their defense.  Because Plaintiff's decision by issuing the PSA to purposely expose

itself to such substantial competitive disadvantages represents a significant alteration of

Plaintiff's litigation, and Defendants' concomitant defensive, strategies reasonably

requiring Defendants' inquiry, Plaintiff's failure to supplement regarding the PSA

represents a material violation of Rule 26(e).

Justification for a liberal interpretation of Rule 26(e) as applicable to later created

information is demonstrated by the facts of the instant case.  The meeting at which the

PSA was discussed in concept as well as the Jacobs Outline and the subsequent email

exchanges – documents Plaintiff contends remain privileged –  which produced drafts

of and the final published version of the PSA, was initiated by Plaintiff's CEO and

attended by several of Plaintiff's attorneys, including one of its general counsel who had

also served as Plaintiff's Rule 30(b)(6) witness, and the lead trial counsel on the instant

litigation who had presumably prepared or oversaw preparation of Plaintiff's responses

to Defendants' Requests.  The initial draft of the PSA was prepared by Angelo and

submitted to participating counsel and others for comment and drafting changes.

Counsel were thus well-aware, or should have been aware, at the time of the meeting

and through the subsequent discussions that Plaintiff's post-closing conduct and

communications with customers regarding the potential danger or risks allegedly associated with the Off-Specification Closures were the subject of major interest to Defendants as evidenced by Defendants' Requests, and therefore relevant to the materiality of any alleged fraud asserted by Plaintiff against Defendants in connection with Defendants' pre-sale disclosures to Plaintiff  regarding the quality deficiencies of the Berkeley forgings used to produce the Off-Specification Closures.

For example, on January 26, 2010, just prior to the February 10, 2010 meeting, Defendants alerted Plaintiff that Defendants expected Plaintiff's designee for a further deposition, as permitted by the court, to address any information arising since Rigot's May 1, 2008 deposition which covered, *inter alia*, Plaintiff's conduct relating to the recall of the affected disclosures.  Marino Declaration Exh. K (email to Matthew E. Liebson, Esq., from David S. Sager, Esq., dated January 26, 2010, scheduling a deposition of Rigot for February 23, 2010) ("we . . . expect the designee to be familiar with any facts that have become known or events that have occurred subsequent to the April 30 - May 1, 2008 deposition pertaining to the topics previously noticed" and suggesting Plaintiff could, as an alternative, certify "nothing has happened or become known . . . given that R&M has not supplemented any discovery responses").  In these circumstances, no unfair surprise or undue burden is placed upon Plaintiff or its counsel in failing to perceive that by authorizing the PSA, the drafting of the PSA by Plaintiff's attorneys and executives, the publication of the PSA, and engaging in related communications with Plaintiff's customers and users of the Off-Specification Closures covered by the PSA including use of the Q&R and "lunch and learn seminars" following its publication, Plaintiff's earlier responses to Defendants' Requests, which specifically requested

documents related to such communications, were materially rendered no longer complete or correct.

In opposition to Defendants' motion, Plaintiff does not contend that the PSA and related documents would not have been responsive had they existed in 2008 when Defendants served their Request for Documents.  Thus, it cannot reasonably be argued that when Plaintiff created and issued the PSA and related documents it had learned neither of their existence nor materiality.  As such, Plaintiff's duty to provide supplemental disclosure of the PSA "in a timely manner" as required by Rule 26(e)(1)(A) concerning the PSA and related documents accrued immediately upon their creation and was not contingent upon Defendants serving Plaintiff with a request for supplementation.  But for the court-authorized further Rule 30(b)(6) deposition of Rigot on September 15-16, 2010  which revealed to Defendant for the first time the existence of the PSA and the meeting, it is uncertain when, if ever, Defendants would have discovered the existence and timing of the issuance of the PSA and related communications and documents, a relevant and material fact, the consideration of which becomes even more important where, as in this case, fact discovery was in its final limited phase prior to required expert disclosures pursuant to Fed.R.Civ.P. 26(a)(2) and likely summary judgment motions.

The court notes Plaintiff's reliance upon *Kingsway Financial Services, Inc. v. Pricewaterhouse-Coopers LLP,* 2006 WL 1295409 (S.D.N.Y. May 10, 2006) ("*Kingsway*") and *Cassirer v. Fragin*, 1997 WL 456217 (Bankr. S.D.N.Y. Aug. 12, 1997) ("*Cassirer*"), Plaintiff's Opposition at 6, for the proposition that Rule 26(e)'s duty to supplement does not extend to documents created by a party after responding to a

request for production.  In *Kingsway*, the court interpreted Rule 26(e) to exclude such after-created documents because "[s]ubsequently created documents do not render a previously served document response <u>incomplete</u> <u>as</u> <u>of</u> <u>the</u> <u>date</u> <u>of</u> <u>the</u> <u>response</u>." *Kingsway*, 2006 WL 1295409, *2.  However, as discussed, Discussion, *supra*, at 27, neither Rule 26(e), as amended in 1993, the version of Rule 26(e) in effect as of the date of the decision in *Kingsway,* nor the associated Advisory Committee notes, limits the duty to supplement by measuring the inaccurate or incomplete nature of the response when served "as of the date of the response."  Rather, both Rule 26(e) in its 1993 version, and the 2006 amended version of Rule 26(e), then required a responding party to provide a supplemental response whenever, as a result of information acquired after the party's response is served, a party learns that the prior response "<u>is</u>" materially incomplete or inaccurate, Appendix to Fed. Rules Civ. Proc., Rule 26, 28 U.S.C. App. at 708 (quoting Fed.R.Civ.P. 26(e)(2)).  Significantly, the text of the rule (and as stated presently in Rule 26(e)(1)(A)) was not limited to such awareness based on the fact that the response, when served, "<u>was</u>" (past-tense of "is") incomplete, an important textual and temporal distinction which contradicts the notion that the supplementation duty under Rule 26(e) excludes later created documents.  A subsequently created document that materially alters the accuracy or completeness of the prior response is therefore subject to supplementation not because the document's creation renders the prior response inaccurate and incomplete "as of the date of the response," as the court in *Kingsway* held, but because "the party learns that the response <u>is</u> in some material respect incomplete or incorrect," as Rule 26(e)(2) then mandated, Title 28, Appendix – Rules of Civil Procedure at 708, and the earlier response has thereby been rendered

32

incomplete or inaccurate when the responding party becomes cognizant of that fact. Moreover, the precedential value of *Kingsway's* holding is somewhat lessened by the court's conclusion that whether defendant's earlier document request covered the later created retention notice at issue was "unclear" under existing law. *Kingsway,* *2.  The court's statement in *Cassirer* that Rule 26(e)(2) imposes no continuing obligation on a responding party to supplement its prior document production responses based on subsequently created documents is, for the same reason, founded on a reading of Rule 26(e)(2) for which there is no support in the rule's past or current text, and is contrary to the authoritative understanding of the scope of the rule as expressed in a leading treatise.  *See* 6-26 MOORE'S FEDERAL PRACTICE - CIVIL § 26.232. Further, as with *Kingsway*, the court's actual holding in *Cassirer*, that a defendant as the requesting party failed to show the subsequently created documents, the trustee's attorney's witness interview notes, rendered the trustee's prior responses materially incomplete, *Cassirer*, *7, limits its support for Plaintiff's position.  Accordingly, this court respectfully declines to follow the *Kingsway* and *Cassirer* holdings, as relied upon by Plaintiff, on the issue of the scope of the duty to supplement under Rule 26(e) as presented on Defendants' motion.  In the instant case, there is little question that the Plaintiff's issuance of the PSA rendered Plaintiff's responses to Defendants' Requests materially incomplete.

Other cases within the Second Circuit, cited by Defendants, Defendants' Reply Memorandum at 3-4, are consistent with the court's conclusion that Rule 26(e) imposes a continuing obligation upon a responding party to supplement prior discovery responses based on later acquired information when the party learns of its existence

and materiality.  *See R.F.M.A.S., Inc. v. Mimi So*, 640 F.Supp.2d 506, 510-11 (S.D.N.Y. 2009) (supplementary copyright registration filed by plaintiff after relevant depositions completed of which defendants were unaware subject to supplementation duty under Rule 26(e)); *Arthur v. Atkinson Freight Lines Corp.*, 164 F.R.D. 19, 19-21 (S.D.N.Y. 1995) (medical records created after plaintiff's initial response subject to continuing duty to supplement as relevant information of which plaintiff's attorney should have been aware as being subject to defendant's earlier document request – defendant under no obligation to serve "successive requests" for updated records); *Llewellyn v. North American Trading*, 1997 WL 177878, *6 (S.D.N.Y. April 11, 1997) (defendant's failure to supplement document production response stating that defendant was not a corporation required supplementary response based on defendant's subsequent merger pursuant to Rule 26(e) duty to supplement).  *See also Weiss v. Chrysler Motors Corporation*, 515 F.2d 449, 457 (2d Cir. 1975) (reversal and new trial ordered based on defendant's failure to supplement interrogatory answers revealing defendant's expert theory of product failure predicated on results of tests conducted after defendant's answers served in violation of duty to supplement pursuant to then Fed.R.Civ.P. 26(e)(1)(B) (duty to reasonably supplement on question addressed to subject matter of expert testimony because such duty was "continuing obligation")); *Gotlin v. Lederman*, 2009 WL 2843380, *3 (S.D.N.Y. Sept. 1, 2009) (the duty to supplement "is triggered only where 'a party [,] or more frequently [its] lawyer, obtains actual knowledge that a prior response is incorrect.'" (citing and quoting *Zubulake v. UBS Warburg, LLC*, 229 F.R.D. 422, 433 (S.D.N.Y. 2004))).  Cases outside this circuit also are consistent with the foregoing holdings requiring supplementation of later created information.  *See,*

34

*e.g.*, *Rodowicz v. Mass. Mut. Life Insurance Co.*, 279 F.3d 36, 44-45 (1st Cir. 2002) (late change in expected trial testimony by plaintiff on material issue required timely supplementation of plaintiff's prior discovery responses); *cf. United States Aviation Underwriters, Inc. v. Pilatus Business Aircraft, Ltd.*, 582 F.3d 1131, 1145 (10th Cir. 2009) (failure to amend interrogatory answer regarding assertion of applicable law because of defendant's later change of position not violation of continuing supplementation duty under Rule 26(e) where plaintiff became aware of change through defendant's pretrial order).[10]

Granted, a rational pretrial discovery system could assign the risk of non-discovery of later created documents, however relevant and material, to the party seeking production, but Rule 26(e) has, since its enactment in 1970, imposed a supplementation duty upon the responding party with the requisite degree of knowledge as to both the advent of later acquired information – whether created or discovered later – as well as its materiality.  Nothing in the text of the present Rule 26(e), its earlier 1970 and 1993 versions, nor in the associated official explanations, suggests an exception from the supplementation duty for later created documents by a responding party with awareness of their relevancy and materiality to the party's prior response, and Plaintiff points to none.

Accordingly, the court finds Plaintiff's contention that the PSA and related

---

[10]   Defendants and Plaintiff rely on *Grand River Enterprises Six Nations, Ltd. v. King*, 2009 WL 1360686 (S.D.N.Y. 2009) in support of their respective positions regarding the proper scope of the duty to supplement under Rule 26(e).  *See* Defendants' Memorandum at 7; Plaintiff's Opposition at 7.  Because, based on its reading of the court's discussion in *Grand River*, this court is unable to determine whether the document at issue – an analysis of plaintiff's costs of producing cigarettes – was created before or after a prior request, the court declines to rely on this case as relevant to the issue.

documents asserted as privileged, documents relating to the Plaintiff's "lunch and learn seminars," the Yale Closure Recall Q&R, and responses to the PSA from Plaintiff's customers are not subject to the duty to supplement under Rule 26(e) is without merit. While the PSA was issued by Plaintiff on March 1, 2010, no copy of the PSA or related documents, including the Privilege Log covering the 31 documents and attachments Plaintiff has submitted for an *in camera* review, was provided to Defendants as of September 20, 2010, after conclusion of the further deposition of Rigot on September 15-16, 2010.  Plaintiff's Opposition Exh. 4; Marino Declaration Exh. F (Letter from Matthew E. Liebson, Esq. to David S. Sager, Esq., dated September 20, 2010, denying Plaintiff had duty to supplement for PSA and related documents).  As the court has determined these documents were subject to Plaintiff's duty to supplement as information material to the accuracy or completeness of Defendants' responses to Plaintiff's Document Requests, but not produced for six months after their creation, the documents were not provided in a "timely manner," as required by Rule 26(e)(1)(A), and Defendants were not otherwise made aware of the information represented by the documents, Plaintiff is subject to sanctions pursuant to Fed.R.Civ.P. 37(c).

Significantly, as noted, Plaintiff does not dispute that the withheld documents are both relevant and material to the accuracy and completeness of Plaintiff's earlier responses to Defendants' Requests pertaining to Plaintiff's communications regarding the Off-Specification Closures, nor does Plaintiff assert Defendants were made aware through discovery of such documents at an earlier point in time through the extended period the court has allowed for additional fact discovery.  In fact, Plaintiff's belated and limited production occurred following the Rigot deposition, as a result of Defendants'

questioning of Rigot, and later demand for the documents, Plaintiff's Exh. 4, substantially and adversely limited Defendants' effective conduct of the Rigot deposition on these material issues raised by the PSA, as a review of the portions of the deposition transcript provided to the court, Marino Declaration Exhs. E & G (*passim*), reveals.  Further, that the PSA and related documents are relevant and material to Defendants' Requests may readily be observed as Plaintiff has previously stated that, as of July 30, 2008, it believed all of the Off-Specification Closures were subject to greater risk of failure from use over time (Deposition of Larry Angelo, July 30, 2008, Plaintiff's Opposition Exh. 2 at 98), yet failed until March 1, 2010, to issue the PSA alerting affected customers and users of the risks associated, in Plaintiff's opinion, with the closures.  Such apparent alteration of Plaintiff's litigation strategy warrants Defendants' careful scrutiny to reduce the opportunity for surprise and prejudice to Defendants including the substance of Defendants' expert disclosures, summary judgment, or at trial.  Given that on January 17, 2000, Plaintiff informed a Canadian Provincial (Alberta) safety agency that Plaintiff's lower pressure Non-Conforming Closures, manufactured by Defendants, posed no threat to safety but that Non-Conforming Closures operating at higher pressures "may be subject to failure," Defendants' Reply Memorandum Exh. A, Plaintiff's decision to issue the PSA covering the 9,000 low-pressure Off-Specification Closures purchased and presumably installed in Plaintiff's customers' pipe systems, not previously proposed by Plaintiff for possible recall, based on the safety risk advanced by the PSA, may be seen by a fact-trier as rendering Plaintiff's claim, that Defendants' failure to make a full disclosure of the Off-Specification Closure problem prior to Defendants' sale of FCE to Plaintiff was a material and thus fraudulent failure to disclose material facts, more

37

doubtful than Plaintiff has alleged.

Therefore, the court finds Plaintiff had a duty to supplement its responses to Defendants' Requests by timely serving Defendants with amendments to Plaintiff's earlier responses to include the PSA and, subject to Plaintiff's belated assertion of attorney-client privilege, Discussion, *infra*, at 41, copies of all related documents.  As Plaintiff failed to effect such timely supplementation, serving some but not all of the relevant documents after the September 2010 Rigot deposition, nearly seven months after their creation, Plaintiff violated Rule 26(e)(1)(A), creating a need for supplemental discovery by Defendants to obviate or reduce the potential prejudice resulting from Plaintiff's failure, Discussion, *infra*, at 85-94, and Defendants' motion seeking sanctions for such violation should therefore be GRANTED.

**B.      Attorney-Client Privilege.**

   **1.      The Parties' Contentions**.

Although Plaintiff's claims in this diversity case[11] are predicated upon Texas anti-business and securities fraud laws, Amended Complaint ¶¶ 59, 61 (Counts III and IV, respectively), thus ordinarily requiring, pursuant to Fed.R.Evid. 501 (in diversity cases law of state providing "rule of decision" determines privilege questions) ("Rule 501"), *see Orbit One Communications, Inc. v. Numerex Corp*., 255 F.R.D. 98, 103 (S.D.N.Y. 2008) (citing *Thompkins v. R.J. Reynolds Tobacco Co.*, 92 F.Supp.2d 70, 75 (N.D.N.Y. 2000)

---

[11]   The parties chose to venue the action in this district apparently for reasons of convenience despite the lack of any basis for personal jurisdiction or such venue pursuant to 28 U.S.C. § 1391.  *See* Amended Complaint ¶¶ 4-5 (waiving issue of lack of venue and personal jurisdiction).

(in diversity actions the privilege law of the state providing the rule of decision applies)),

the application of Texas law to questions of attorney-client privilege, the parties have

throughout the instant proceedings, alluded to federal caselaw, *Robbins & Myers, Inc. v.*

*J.M. Huber Corporation*, 2003 WL 21384304, *1 n. 6 (W.D.N.Y. May 9, 2003) (parties

relied "extensively on federal common law governing the attorney-client privilege" (citing

*Tehran-Berkeley v. Tippetts-Abbett*, 888 F.2d 239, 242 (2d Cir. 1989))), and have again

done so on Defendants' motion with respect to issues of attorney-client privilege

("privilege" or "attorney-client privilege").  *See, e.g.,* Defendants' Memorandum at 10

(citing federal caselaw in support of contention that Plaintiff waived attorney-client

privilege in all documents relating to the PSA); Plaintiff's Opposition at 9-10 (citing

Second Circuit caselaw).  Accordingly, the court deems that the parties have,

notwithstanding Rule 501, stipulated to federal caselaw, particularly with respect to

caselaw within the Second Circuit, on the privilege issue raised by Defendants' motion.

*Robbins & Myers, Inc.*, 2003 WL 21384304, *1 n. 6. (finding parties consent to federal

common law on attorney-client privilege sufficient ground to apply federal law to privilege

issue); *see also Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*, 215 F.R.D. 466,

470 (S.D.N.Y. 2003) (where in diversity case parties primarily refer to New York law on

issue of attorney-client privilege, New York law applied based on parties' implied

consent).

The documents at issue on Defendants' motion relate to a Public Service

Announcement ("the PSA") drafted by Plaintiff during the period February 10, following

the discussion among several of Plaintiff's executives and attorneys on that date at

which a decision to issue the PSA was made by Plaintiff, to March 1, 2010, when the

PSA was published by Plaintiff on Plaintiff's website, emailed or sent to Plaintiff's customers and users, Facts, *supra*, at 6-11, who had purchased the Off-Specification Closures, as well as other pipeline companies, distributors, and fabricators.  September 16, 2010 Rigot Deposition, Marino Declaration, Exh. E at 16.  Plaintiff also published the PSA in a pipeline industry magazine, the *Pipeline & Gas Journal*, considered by Plaintiff to be the "gold standard" for pipe-line companies.  *Id.* at 16, 32.

Defendants contend the 31 documents submitted by Plaintiff for *in camera* review, and enumerated in Plaintiff's Privilege Log, are not privileged and are thus discoverable for several reasons.  First, Defendants argue, without specifics, that the documents are not privileged communications, Defendants' Memorandum at 8, an argument the court therefore construes as based on a lack of confidentiality.  Second, Defendants contend that because the subject of Plaintiff's February 10, 2010 "business" meeting – the decision to create and issue the PSA – is identical to the subject of the drafting of the PSA, including the text of the PSA, the subsequent drafting communications and documents relating to the PSA among Plaintiff's executives and attorneys are of the same non-legal character and therefore not privileged, or that Plaintiff's waiver of the privileged nature of the meeting, resulting from Rigot's deposition testimony disclosing fully the purpose and substance of the conversations at the meeting, (which Defendants argue was, because of the presence of several of Plaintiff's attorneys, of a privileged character) extends to the subsequent drafting activity of Plaintiff's attorneys and executives implementing the discussions and decisions to prepare and publish the PSA constituting a subject-matter waiver.  Defendants' Memorandum at 8-9; Defendants' Reply Memorandum at 6; Defendants' Supplemental

Memorandum at 7-8.  Defendants alternatively contend that if, as Plaintiff asserts, the February 10, 2010 discussion was in fact of a business nature and therefore not privileged, by the same token, all subsequent communications leading to the PSA's publication are similarly of a business and non-legal character and thus also unprivileged.  *Id.*  Plaintiff opposes this assertion arguing that "there is no basis to conclude that the existence of business discussions precludes an assertion of legal privilege for communications after such a meeting," that is to say, the involvement of Plaintiff's attorneys in the subsequent drafting process was within the privilege even if their communications with Plaintiff's executives during the February 10, 2010 meeting, as Plaintiff maintains, were not.  Plaintiff's Supplemental Memorandum at 5.  Third, Defendants contend that because Plaintiff failed to timely produce a privilege log covering the disputed documents under its duty to supplement, as required by Fed.R.Civ.P. 26(b)(5)(A), Plaintiff waived any possible privilege that may have attached to the documents.  Defendants' Memorandum at 8 (citing *A.I.A. Holdings, S.A. v. Lehman Bros.*, 2000 WL 1538003, *3 (S.D.N.Y. Oct. 17, 2000)); Defendants' Reply Memorandum at 8.  Plaintiff's opposition to this contention is based on the fact that, according to Plaintiff, the privilege log describing documents pertaining to the post-meeting drafting of the PSA was promptly served following Defendants' written discovery required by letter dated September 17, 2010, Plaintiff's Opposition at 8-9;  Plaintiff's Opposition Exh. 4, (Letter of September 17, 2010 from David S. Sager, Esq. to Leslie W. Jacobs, Esq.).

> **2.**    **The Documents Lack the Required Indicia of Confidentiality**.

The requirements for assertion of the attorney-client privilege ("the privilege") to a

particular communication between a client and attorney are well-established. *See*

*United States v. Int'l. Bhd. of Teamsters,* 119 F.3d 210, 214 (2d Cir. 1997) (citing *In re*

*Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1036

(2d Cir. 1984)).  In order for the privilege to apply, the communication must be made in

confidence for the purpose of obtaining legal advice or services, and without a waiver of

the privilege. *Id.*  The burden of establishing each element of the privilege, including the

absence of any waiver, is upon the party asserting the privilege. *Id.* (citing *United States*

*v. Schwimmer*, 892 F.2d 237, 234 (2d Cir. 1989)); *see also In re Keeper of the Records*

*(XYZ Corp.),* 348 F.3d 16, 22 (1st Cir. 2003) ("the party who invokes the privilege bears

the burden of establishing that . . . it has not been waived").  *See Int'l. Bhd. of*

*Teamsters*, 119 F.3d at 214 (stating party asserting attorney-client privilege bears

burden of establishing each element of the privilege, including that the "protection" has

not been waived).  Although the privilege achieves the beneficial purpose of facilitating

communications between attorneys and clients, *Int'l. Bhd. of Teamsters*, 119 F.2d at 214

(citing *Commodity Futures Trading Comm. v. Weintraub*, 471 U.S. 343, 348 (1985)), as

the privilege limits the admissibility of relevant evidence in judicial and other

proceedings, it is strictly construed.  *Id.* (citing *In re Horowitz*, 482 F.2d 72, 81 (2d Cir.)

(citing 8 Wigmore, EVIDENCE §§ 2192 at 70, 554 (1961)), *cert. denied*, 414 U.S. 867

(1973)).

Because the privilege encourages a client to provide needed information to the

attorney to facilitate providing effective legal advice and services, *Upjohn Company v.*

*United States*, 449 U.S. 383, 390 (1981), communications between client and attorney

intended for publication or communication to third-parties, are not intended to be

confidential when made in order to obtain legal assistance and therefore are not within the privilege.  *In re von Bulow*, 828 F.2d 94, 102 (2d Cir. 1987) ("conversations not intended to be confidential, but . . . meant to be passed on to third parties" not privileged (citing *United States v. Tellier*, 255 F.2d 441, 447 (2d Cir.) ("It is . . . essence of the attorney-client privilege that it is limited to those communications which are intended to be confidential"), *cert. denied*, 358 U.S. 821 (1958))); *Diversified Group, Inc. v. Daugerdas*, 304 F.Supp.2d 507, 512 (S.D.N.Y. 2003) (the attorney-client privilege exists to protect both attorney's giving of professional advice to client, as well as client's communications to attorney to enable attorney "to give sound and informed advice." (citing *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981))).  "[I]t is well established that communications between an attorney and his client, though made privately, are not privileged if it was understood that the information communicated in the conversation was to be conveyed to others."  *Tellier*, 255 F.2d at 447 (citing caselaw).  *See Calvin Klein Trademark Trust v. Wachner*, 124 F.Supp.2d 207, 209-10 (S.D.N.Y. 2000) (proposed press release relating to possible acquisition and memorandum requesting comments of putative seller's attorneys not confidential communication for the purpose of obtaining legal advice).  "Whenever the matters communicated to the attorney are intended by the client to be made public or revealed to third persons, . . . the element of confidentiality is wanting."  5 McCormick on Evidence § 91 at 408 (Kenneth S. Broun, 6th ed. 2006).

In *Tellier*, a securities fraud case, the court found that defendant's attorney's advice regarding defendant's contemplated business proposal to others was not "understood" by either defendant or the attorney "to be confidential."  *Tellier*, 255 F.2d at

447.  Rather, the court found the record established that the attorney's opinions and comments on defendant's proposed issuance of additional debentures was to be forwarded to third parties for "their enlightenment," and thus were not privileged.  *Id.* Specifically, that the actual letter submitted by counsel to defendant described defendant's proposal in "more formal terms" than the actual pejorative characterization employed by the attorney in his prior telephonic conversation with defendant in discussing the attorney's opinion of defendant's proposed solicitation, *id*. at 448, (defendant's proposal was "a Ponzi scheme") did not require finding that the specific words used by the attorney to describe defendant's proposal, although not included in the eventual letter, were intended to be confidential because "the privilege attaches to the substance of a communication and not to the particular words used to express the communication's content."  *Id.*  Thus, the court held that because defendant failed to establish that the substance of the conversations was intended to be confidential, "not only the specific information, but the more detailed circumstances relating to it are subject to disclosure."  *Id.*  Therefore, in addition to the actual letter prepared by counsel and intended for mailing to third-parties, the court, in *Tellier,* determined that counsel's earlier oral, and damaging, description to defendant of defendant's proposed offering as intended to be communicated to third-parties by the defendant client lacked the required degree of intended confidentiality to warrant application of the privilege.  *Id.*

Other federal courts agree that, as in *Tellier*, where clients engage attorneys for the purpose of preparing documents to "convey information to third parties rather than to provide legal advice for the client's own guidance," such communications and the related underlying details, including all preliminary drafts of documents prepared by counsel and

counsel's drafting notes, are not considered confidential and thereby are not privileged. *See, e.g., United States v. (Under Seal),* 748 F.2d 871, 875 n. 7 (4th Cir. 1984) (communications intended to facilitate tax attorney's preparation of proposed tax ruling and other documents relating to expected public corporate transactions not confidential and thus unprivileged because public "character" of document); *United States v. Oloyede,* 982 F.2d 133, 141 (4th Cir. 1993) (communications to attorney intended for use to file fraudulent citizenship applications to INS not protected as confidential communications).

The client's "intent to [maintain confidentiality] is inferrable from the circumstances."  *(Under Seal)*, 748 F.2d at 875 (quoting Advisory Committee Notes to Supreme Court Standard 503(a)(4) (bracketed material in original)).  *See also Colton v. United States*, 306 F.2d 633, 638 (2d Cir. 1962) (client information communicated to attorney to facilitate preparation of federal tax returns "not intended to be confidential" but intended to be transmitted to others and therefore not privileged).  *Compare von Bulow,* 828 F.2d at 102 (defendant's conversations with his appellate counsel regarding specific issues in defendant's case "were originally intended to be confidential and were therefore privileged").  *See Leucadia, Inc. v. Reliance Ins. Co.*, 101 F.R.D. 674, 676 (S.D.N.Y. 1983) (restatement by client of advice of counsel in unprivileged communication waived privilege (citing *United States v. Int'l. Business Machines*, 71 F.R.D. 376 (S.D.N.Y. 1976)));  *see also Chesapeake & Ohio Railway Company v. Kirwan*, 120 F.R.D. 660, 666 (S.D.W.Va. 1988) ("information intended to be disclosed to others is not shielded though, because of subsequent events, the publication, filing or communication envisioned never transpires.").  Unless the client indicates a proposed

document prepared by counsel to be communicated to a third-party is not to be communicated, the document is unprivileged. *(Under Seal)*, 748 F.2d at 876 (failure to instruct attorney not to proceed with publication confirms communications not intended to be confidential).

Draft documents prepared by a client and submitted to counsel to facilitate rendering legal advice on proposed transactions may remain privileged although the final version was intended for distribution to third-parties provided the draft documents demonstrated an intent to seek confidential legal advice on their content. *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1037 (draft documents seeking legal advice not eventually disclosed remain privileged despite intent to disclose final version absent indicia of a waiver); *Calvin Klein Trademark Trust v. Wachner,* 124 F.Supp.2d 207, 210 (S.D.N.Y. 2000) (absent intent to use draft materials affirmatively in subsequent litigation publication of final document does not waive privilege in draft materials communicated by client to enable counsel to advice on extent of required business disclosures).  In contrast to the facts in *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983,* and *Calvin Klein Trademark Trust*, the court finds none of the documents with the Privilege Log submitted by Plaintiff for review in this case, Discussion, *infra,* at 52-66, seek or provide legal advice, and all of the information discussed in the documents – including Plaintiff's stated opinion regarding the risk of closure failure, technical information to enable customers to identify and seek replacement of any closures manifesting abnormal signs of potential failure, casting Defendants with the responsibility for the problem – was intended for eventual publication to third-parties and Plaintiff's tactical use against Defendants in this litigation.

*See  In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983,* 731 F.2d at

1037 ("no basis in the record for inferring that AG did not intend that drafts [reflecting

confidential requests for legal advice] . . . to be confidential.");*Calvin Klein Trademark*

*Trust*, 124 F.Supp.2d at 210 (recognizing that disclosure of subject matter intended to be

used against adversary in pending litigation waives privilege allowing "adversary to

inquire about the basis or accuracy of the disclosure.").  A fair reading of the disputed

documents support finding that the thought process and communications among

Plaintiff's executives and attorneys were entirely directed, not to the legal advisability of

the proposed content of the PSA and its publication, but to how most effectively inform

Plaintiff's customers of the potential risk of the affected closures and Defendants'

responsibility for failing to take action to obviate the need for such information. Thus, the

entire substance, if not actual details, expressed in the communications reflected in the

author's memorandum, notes, and emails was motivated not by any expectation of

confidentiality incidental to seeking or providing legal advice or services, but, rather, to

disseminate such formulations to Plaintiff's customers and users of the closures and the

pipe-line industry as third-parties.  Significantly, Plaintiff provides no affidavit by any

author of the documents attesting the contrary.  For instance, Plaintiff does not argue

Rigot's advice to delete Jacobs's proposed language urging recipients of the PSA to

submit claims to Defendants constituted legal advice.  Discussion, *infra*, at 62.

Therefore, the information contained in documents listed in the Privilege Log was not

intended to remain confidential to facilitate legal advice or services, and therefore the

documents are not privileged.

### 3.    **The Documents Relate to Business Not Legal Advice**.

Even if the client's communications with an attorney are confidential, merely because an attorney is consulted by a client does not render the ensuing communications privileged if the purpose of the consultation is to obtain other than legal advice or services.  *See In re County of Erie*, 473 F.3d 413, 421 (2d Cir. 2007) (attorney consultation for purpose other than attaining legal advice is not privileged); *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1037 ("the privilege is triggered only by a client's request for legal as contrasted with business advice" (citing *In re John Doe Corp.*, 675 F.2d 482, 488 (2d Cir. 1982))); *Reino de Espana v. American Bureau of Shipping*, 2005 WL 3455782, **2-3 (S.D.N.Y. Dec. 14, 2005) (emails among a party's executives and in-house attorney containing "non-legal discussions of business-related issues" including "public relations strategies," not privileged particularly where employees outside legal department are recipients and "legal issues do not predominate.").  *See also Spectrum Systems Intern. Corp. v. Chemical Bank*, 581 N.E.2d 1055, 1061 (N.Y. 1991) ("a lawyer's communication is not cloaked with privilege when the lawyer is hired for <u>business</u> or personal <u>advice</u>, or to do the work of a nonlawyer").  Here, Plaintiff maintains the February 10, 2010 meeting, in which several of Plaintiff's attorneys participated, was conducted to discuss a business matter, *i.e.*, whether to issue the PSA as a means of providing notice to Plaintiff's customers of the potential risk of failure of any closures subject to the PSA and assigning responsibility for such potential failure to Defendants, but argues notwithstanding that the subsequent email communications among Plaintiff's executives and attorneys who participated in drafting the PSA included legal advice and services and, therefore, were privileged.  Plaintiff's Supplemental Memorandum at 4-5; Transcript

of Oral Argument, November 15, 2010 (Doc. No. 323) at 108.[12]   As noted, Discussion,

*supra*, at 42, because the privilege is to be strictly construed and Plaintiff has the burden

to establish it applies, as well as the absence of a waiver, the court finds Plaintiff's

dichotomy to be without substance in this case and thus insufficient to support finding

the documents relating to the PSA drafting process, as detailed in the Privilege Log, to

be within the privilege.

Rigot's deposition makes clear that the Plaintiff's executives and attorneys who

participated in the meeting concluded that Plaintiff's customers should be notified of the

potential for failure of the Off-Specification Closures purchased by the customers

(including those subject to Plaintiff's 2000 recall) as well as Defendants' continued

failure to take action in respect to such risk, and that all participants at the meeting

agreed with this conclusion.  Rigot Deposition, September 15, 2010, Marino Declaration

Exh. G at 22.  Accordingly, Rahimian directed Angelo, one of Plaintiff's vice-presidents,

to prepare a draft of the PSA "consistent with the discussions at the meeting."  Rigot

Deposition, September 16, 2010, Marino Declaration Exh. E at 71.  Although the

portions of Rigot's testimony appended to Defendants' motion, Marino Declaration Exhs.

E, G, do not specify that the meeting decided the PSA should also emphasize

Defendants' responsibility, Rigot's testimony demonstrates, as noted, that Rahimian

---

[12]

| The Court: | " . . . at the [February 10, 2010] meeting when the concept of the PSA is discussed, there was no attorney-client privilege attaching to that discussion?" |
|---|---|
| Liebson: | "That was a business discussion, yes." |
| The Court: | "You are saying . . .  that during the drafting process of the actual document, that legal services were provided of a confidential nature?" |
| Liebson: | "Yes, absolutely." |

directed Angelo prepare the initial draft of the PSA "consistent with the discussions at the meeting."  Marino Declaration Exh. E at 71.  As Angelo's first draft of the PSA, Doc. No. 8 (RM 8-9), among the documents submitted for *in camera* review, and all the subsequent drafts included detailed references to Defendants' responsibility for the risks of failure of the closures, the court finds that this component of the purpose and content of the PSA was also discussed and agreed upon at the meeting, and thus that both were intended for inclusion in a public document to be issued by Plaintiff.  However, despite being present for the entire meeting and in the drafting of the PSA, Rigot denied any knowledge of the reason the PSA focused on Defendants' failure to notify customers about the affected closures and accept responsibility for their defects and potential risks. Marino Declaration Exh. E at 107.

Contrary to Plaintiff's contention that the subsequent communications between Plaintiff's attorneys and Plaintiff's executives in drafting and publishing the PSA constituted confidential communications for the purpose of providing legal advice and services in the process of drafting the final version of the PSA, an examination of Plaintiff's documents submitted for *in camera* inspection indicates that in nearly every instance, the suggestions or issues raised by counsel, including Jacobs, lead counsel in the instant litigation, related to questions of clarity and technical matters in the text of the draft PSA intended to achieve the specific business objectives for the PSA as established during the meeting – to notify customers of the then potential risks associated with the closures and especially Defendants' responsibility for such risks. For example, that Jacobs's suggested revisions to Angelo's initial draft of the PSA, making even more explicit that Defendants (and, by implication, not Plaintiff) were responsible

for the supposed problem with the Off-Specification Closures described by the PSA, and thus were not legal advice, is reinforced by the fact that Angelo's initial draft, Doc. No. 7 (RM 7), itself stated these same concepts, consistent with Rahimian's direction as testified to by Rigot, that the PSA was intended by Plaintiff to carry out the business conclusions, including matters of public relations with Plaintiff's customers and others, reached at the meeting related to the objectives of the PSA.  *See Reino de Espana*, 2005 WL 3455782, *3 (inclusion of "public relations strategies" in notes of executive reflecting conversation with in-house counsel not privileged).  As such, the record demonstrates that the substance of the communications, including technical and other factual information for inclusion in the PSA, and probable reactions of recipients and Defendants among Plaintiff's executives and counsel was intended to be disclosed to third-parties as a public announcement by Plaintiff, and not intended as confidential communications for the purpose of obtaining legal advice or services.  Plaintiff's insistence that the drafting documents covered by the Privilege Log are within the privilege is also significantly weakened by the fact that, despite having the burden to do so, Plaintiff makes no attempt to explain why the documents are privileged other than ascribing to each document the letters "AC" (attorney-client) as a basis for asserting the privilege in the log.

Therefore, as more fully discussed, Discussion, *infra*, at 52-66, the court finds that Plaintiff has failed to meet its burden to establish the PSA was agreed upon and produced in reliance upon the expectation that Plaintiff's attorneys were to provide and did provide confidential legal advice in connection with preparing the PSA, or as part of legal services rendered by Plaintiff's attorneys in producing the PSA, and thus none of

the communications, described in the Privilege Log, involving, *i.e.*, to or from, Plaintiff's attorneys – Jacobs, Harson, Liebson or Rigot – in the process of drafting the PSA are within the privilege.

4.     **The Documents Are Not Privileged**.

Applying these settled principles governing application of the privilege, and having reviewed each document covered by the Privilege Log, the court finds that none of Plaintiff's documents submitted by Plaintiff for *in camera review* constitute a confidential communication, prerequisite to applying the privilege, seeking or providing legal advice or services.  Document No.1 (RM 1) is an email from Harson to Rahimian and Angelo transmitting a three-page outline prepared by Jacobs, Plaintiff's principal outside counsel in this case, for use by participants at the February 10, 2010 business meeting. Contrary to Plaintiff's assertion in its Privilege Log, this document is not within the privilege for several reasons.  First, as Plaintiff itself insists, the meeting was called and conducted as a business meeting outside the privilege, and Plaintiff fails to explain how a suggested outline, albeit prepared by an attorney at Harson's request, as a guide to such unprivileged business discussions is itself privileged.  Second, the document basically conveys numerous items of publically known factual information, reiterating the history of the closures issue, and Plaintiff's options in advising users about Plaintiff's safety issues, and thus carries no indicia the document was intended as a confidential communication or otherwise constituted legal advice or guidance.  Third, Jacobs Outline, dated January 29, 2010, directed to Linn Harson, Plaintiff's in-house general counsel, and Joseph Rigot, a member of Jacobs's law firm, Plaintiff's principal outside general counsel, and forwarded to Rahimian, Plaintiff's CEO, and Angelo, one of Plaintiff's

senior executives ("lean vice-president"), respectively, lists 17 information items which, based on the pleadings and numerous papers filed in this action, relate to facts previously disclosed through pleadings and the discovery process in this case.  Although a communication among counsel to a party may be privileged, *In re County of Erie,* 473 F.3d at 419, a privileged communication of facts does not prevent discovery of the underlying or asserted facts nor, absent an intention to convey legal advice, as demonstrated by a perusal of the outline, constitute a privileged communication.  *In re Six Grand Jury Witnesses*, 979 F.2d 939, 943-44 (2d Cir. 1992) (attorney client privilege protects communications of legal advice, but not underlying facts).  Moreover, that these facts have previously been disclosed in this case destroys any possibility that their restatement by Jacobs renders them privileged as communicated to Angelo, Harson, and Rahimian.

Further, paragraph 18 of the Jacobs Outline, lists five "alternatives" available to Plaintiff in regard to the closure issue.  None are privileged.  First, as discussed, Discussion, *supra*, at 47-52, because Plaintiff contends and concedes the meeting was called by Rahimian to discuss and reach a business decision, it follows that all of the "alternatives" formulated by Jacobs to facilitate discussion and potential decisions at the meeting must therefore constitute business, and not legal, advice, prepared by Jacobs at Harson's request to guide discussions at the meeting, suggested alternatives of a non-privileged business nature which may be of assistance to the meeting participants in considering what steps Plaintiff should then take in regard to whether to provide information at that time regarding the affected closures to Plaintiff's customers and users of the closures – third parties – and, as such, do not come within the privilege.

Moreover, because paragraph 18d of the Jacobs outline suggested giving Plaintiff's customers who had purchased Off-Specification Closures "notice" of Defendants' sales of these closures and "urge inspections or replacement," such advice was also information intended to be conveyed publically to a third-party and, as a result of Plaintiff's decision to publish the PSA, this suggested course of action was in fact carried out.  Accordingly, this information was not intended as a confidential communication rendering legal advice nor upon which legal advice was given.  Thus, this document was not intended as providing, and did not provide, confidential legal advice or service by Jacobs to Plaintiff and, accordingly, it is not privileged.

Document No. 2 (RM 4) is a page of handwritten notes made by Angelo during the meeting.  As with Doc. No. 1, Plaintiff fails to explain how notes made by a non-lawyer at a unprivileged business meeting, at which Plaintiff claims no confidential privileged communications took place, constitute material within the privilege. Additionally, there is no indication these notes were made at the direction of one of Plaintiff's attorneys for the purpose of facilitating legal advice or were to be forwarded, or were forwarded to, Plaintiff's attorneys to facilitate legal advice or services and, given that the business meeting, as well as the ensuing discussions at the meeting among the participants, including Plaintiff's attorneys, were unprivileged, as Plaintiff concedes, Angelo's notes relating to the topics and the respective discussions by participants at the meeting are equally outside the scope of the privilege.

Document No. 3 is an email from Rahimian to Harson, with copies to the meeting's participants, suggesting creation of an expected frequently asked questions and answers list regarding probable customer reaction to the PSA to assist Plaintiff's

outside sales force in answering customer questions about the, including Plaintiff's offer to replace defective closures, the PSA (Doc. No. 2). The email, which asserts it is a privileged document, also identifies Plaintiff's "lunch and learn seminars" that would be used to discuss with Plaintiff's customers the risks of failure of the affected closures. *Id.* The email did not request legal advice regarding the PSA or the conduct of the "lunch and learn seminars" from Harson; rather, it called for development of factual information to be used in communicating with third-parties, Plaintiff's customers, as agreed upon at the non-privileged meeting in response to any questions such customers may be prompted to ask in response to the PSA. As such, the substance of the email was not intended by Plaintiff to serve as a confidential communication to counsel to obtain legal advice or services and is, therefore, not privileged.

Document No. 4 (RM 5-6) is an email from Jacobs to Rahimian sent later the same day of the meeting on February 10, 2010, with copies to the other meeting participants, in which Jacobs suggests a further decision on whether the agreed upon communication, *i.e.*, the PSA, to Plaintiff's customers who had purchased the Off-Specification Closures, should be denominated by Plaintiff as a public service notice. As the email is directly related to the business purpose of the meeting to provide Plaintiff's customers with Plaintiff's advice regarding the potential risk of failure of the closures at that time and Defendants' continuing lack of responsible action with respect to this risk as perceived by Plaintiff, and because the substance of such a notice or warning was intended to be communicated to third-parties, the email was not intended to be confidential, relates to a business considerations not legal advice, and is not privileged.

Document No. 5 (RM 5) is an email from Rahimian to Jacobs sent later in the day

of the meeting, with copies to other meeting participants,[13] informing Jacobs of Rahimian's preference that the intended public communication should be called a "public service message" while noting that such a characterization may adversely affect Plaintiff's position in this litigation because of Plaintiff's decision not to denominate the communication as a recall of the affected closures.  As such, that the email discusses a subject – what to label the PSA as a communication intended for publication to third-parties – it is a communication which includes Rahimian's acknowledgment of the impact of such publication may have on Plaintiff's case and, without any indication it constituted a request for legal advice.  As such, the email is not privileged.

Document No. 6 (RM 5) is Jacobs's email response to Rahimian's expressed preference to describe the communication as a public service announcement ("PSA") as described in Document No. 5 (RM 5).  In this email, Jacobs suggests that, in order to justify labeling the communication as a public service announcement rather than a formal product recall, the PSA should recount the history of Plaintiff's acquisition of FCE, Plaintiff's belated discovery of the full extent of Defendants' sales of the Off-Specification Closures, as well as the Plaintiff's prior limited recall of some of the closures, all previously known facts in this case.  In the email, Jacobs also suggests stating in the PSA that the low-pressure, *e.g.,* 6-inch, Off-Specification Closures, are in Plaintiff's

---

[13]   Unless indicated otherwise, copies of each email were sent to all meeting participants, *i.e.*, Angelo, Harson, Jacobs, Rahimian, Rigot, and Sparkman.  Copies of Privilege Log Doc. Nos. 6, 10, 12-14, 16, 18 and 27 were also sent to Matthew E. Liebson, another of Plaintiff's outside attorneys appearing in this case, who did not participate in the meeting; however, because it does not change the business nature of the meeting nor alter Plaintiff's intent to communicate the subject matter of the meeting to third parties, Liebson's receipt of the documents does not affect the court's analysis.  Copies of Privilege Log Doc. Nos. 3, 4-7, 9, 21, 24, 28, 29, 31 were sent to Sparkman; a copy of Doc. No. 7 was sent to O'Day; Doc. No. 20 was sent to Kristoff; Doc. No. 21 was sent to Chiles; Doc. No. 25 was authored by Sparkman and sent to Angelo; Doc. No. 28 was sent to Chiles and copies to Lusk and Hobbs; Doc. No. 31 was sent to Kristoff.

opinion, for several reasons, becoming dangerous, and that because of Defendants'

failure to take any responsible action there is, at present, a potential safety risk to the

public and for harm to Plaintiff's commercial reputation in case of failure of an affected

closure.  In the email, Jacobs further suggests recipients of the PSA be advised to

present any claims for compensation arising from the risk of such failure, including any

damages caused by failure of a closure, to Defendants.  As with the other documents

discussed, Discussion, *supra*, at 52-55, (Documents 1-4), both Document Nos. 5 and 6

are directed to the content and description of a document Plaintiff intended to publically

disseminate and as such are not confidential.  On their face, Jacobs's comments

indicate he expected Rahimian to concur in Jacobs's proposed rationale for labeling the

publication as a PSA, as Rahimian preferred, demonstrating Rahimian's expectation,

like Jacobs's, that Jacobs's suggested changes were to be included in the PSA thus

negating that, as to Jacobs's communication, Plaintiff held any intention that the

communication in detail or in substance was, or was to remain, confidential.  The

suggested assertion in the PSA of Defendants' responsibility for any damages, past or

future, resulting from a failed closure, as proposed by Jacobs in this email, was also

revealed publically by Plaintiff in the Amended Complaint in which Plaintiff requested

declaratory judgment to such effect as one of Plaintiff's principal causes of action

(Amended Complaint, Count V).  As such, neither communication was, when made,

intended to be, or to remain, confidential.

　　　　Moreover, Rahimian's email did not request legal advice and Jacobs's response

does not proffer legal advice; instead it provides a rationale for referring to the PSA as a

praiseworthy service to Plaintiff's customers rather than as a more explicit, and

potentially embarrassing to Plaintiff, formal product recall of the closures remaining installed, creating the appearance that the PSA is consistent with Plaintiff's prior recall effort restricted to a limited number of so-called high-pressure Off-Specification Closures as to which Plaintiff had been advised presented a more immediate risk of potential failure.  The court therefore finds Document No. 6 constitutes information previously publically disclosed, intended for public information and guidance and to promote and maintain customer and public favor rather than a confidential request to facilitate legal advice to Plaintiff.

As in *Tellier*, Rahimian's acknowledgment, expressed in the email, that referring to the PSA as public service could expose Plaintiff to Defendants' rebuttal in this litigation that the risk of closure failure is similar to defendant's attorney's telephonic and detrimental statement to defendant in *Tellier* that defendant's proposed debenture offering was a fraudulent "Ponzi scheme" and, as a preliminary statement leading to the formal letter  to third-parties on which the later formal letter to prospective investors from defendant's attorney was based, the statement was no more confidential than the letter to third-parties itself.  *Tellier*, 255 F.2d at 447-47.  As such, Rahimian's comments constitute "a circumstance" related to specific non-confidential information outside the privilege.  *Id.* at 448.  Additionally, as the meeting and the resulting decision to issue the PSA were for business purposes, neither Jacobs's proposed rationale for the PSA, or Rahimian's response, provided nor sought legal advice.  Thus, neither Document Nos. 5 or 6 is privileged.

Doc. No. 7 (RM 7), an email of February 16, 2010 from Angelo to Sparkman, Rahimian and Jacobs, transmits a draft of the PSA (Doc. No. 8) (RM 8-9) prepared by

Angelo, at Rahimian's direction on February 10, 2010, and advises Jacobs that certain technical and customer information regarding the closures had previously been provided to Jacobs.  Angelo's email unquestionably pertains to the PSA, a document intended by Plaintiff as a public communication, is not a confidential communication to counsel, does not request legal advice from Jacobs, and attaches the initial draft of a document, the PSA, and neither the email nor draft of the PSA are privileged.

Document No. 9 (RM 10) is an email from Rahimian, dated February 17, 2010, to Angelo, Jacobs and Sparkman referring to Sparkman's suggested amendments to the draft PSA and proposing several stylistic changes.  The email also complains about the apparent, in Rahimian's opinion, apologetic tone of the draft.  As a comment relating to the drafting of the PSA, Plaintiff's intended public communication reflecting Plaintiff's business purposes for the PSA, the substance of the email was not intended to be confidential when offered, does not seek legal advice, and is, accordingly, not privileged.

Document No. 10 (RM 11) is a February 17, 2010 email from Jacobs to Rahimian and Angelo attaching a draft of the PSA (Doc. No. 11) (RM 12-13) including Jacobs's suggested changes and informing that these changes are intended to inculpate Defendants for the problems created by the affected closures while exonerating Plaintiff.  In the email, Jacobs also refers to inclusion of technical data about the subject closures, suggests Plaintiff advise one of Plaintiff's largest distributors of the affected closures of the PSA prior to publication, recommends clarifying that the PSA does not promise that Plaintiff will replace any closures, and concludes that directing such blame worthiness to Defendants will provoke Defendants to complain.  (RM 11).  That Jacobs's changes were, when proffered to Plaintiff, intended to be made public in the PSA is self-evident

from the text of the email and the referenced proposed changes in the draft PSA.

Although Jacobs's more explicit proposal – that recipient customers should direct any

compensation questions to Defendants – was not included, because of reservations, not

specifically revealed in the Privilege Log's documents, expressed by Rigot, (Doc. No. 16)

(RM 19) (*see* Discussion, *infra*, at 62), in the final text of the PSA (Doc. No. 31 - RM 37),

Jacobs's suggestion directing a PSA recipient's attention to the fact that Defendants had

failed to notify its previous customers regarding the defective material used to

manufacture the Off-Specification Closures and associated risks arising from such use,

as alleged by Plaintiff, was ultimately included in the PSA, as well as a statement calling

upon Defendants to take responsibility for the closures's defects and replacements.

(RM 37 at 2).  It is thus apparent that Jacobs's intent, expressed in the February 17,

2010 email, was that his suggested changes were to become known to third-parties –

Plaintiff's customers and others – and as such were not intended when made to be

confidential communications providing legal advice or services to Plaintiff.

That Jacobs's stronger assertion, urging users to request compensation from

Defendants, was not specifically included in the PSA does not overcome a finding that

the essence of the suggested language, when communicated, was so intended and thus

the suggestion was not intended to remain confidential even if not specifically included in

the final version of the PSA.  *See Chesapeake & Ohio Railway Company*, 120 F.R.D. at

666 (information intended for public disclosure unprivileged despite fact that document

not published as expected).   Additionally, Jacobs's proposal to publically condemn in

the PSA Defendants for inaction in regard to the closures, encouraging disaffected

customers to seek redress from Defendants, and his expressed satisfaction in his

proposal or in provoking Defendants' ire in reaction to the PSA (depending on one's interpretation), plainly do not constitute legal advice or services.  Even assuming Jacobs's proposal to restate Plaintiff's legal position in this litigation, that under the FCE acquisition agreement Defendants are legally responsible for damages resulting from the Non-Specification Closures, as alleged in Plaintiff's declaration judgment claim, reveals an intent to offer a legal opinion, such opinion is unprivileged as it was intended not for Plaintiff's legal guidance but to benefit and influence the conduct of recipients of the PSA as to whom Jacobs in all probability lacks a professional relationship.  Plaintiff does not contend otherwise.  As such, this email and the attached draft (Doc. No. 10) (RM 11) are not privileged.

Documents Nos. 12-13 (RM 14-15) are February 17, 2010 emails from Angelo to Rahimian and Jacobs referencing dates of manufacture of the defective 6-inch and 4-inch closures.  However, the emails seek no legal advice, the information communicated pertains to underlying and known facts that are not confidential or within the privilege, and which were intended to assist in shaping the text of the PSA, a document Plaintiff intended to publish with such information.  As such, there was no intention that the emails conveyed confidential information for the purpose of obtaining legal advice when the emails were sent and, accordingly, neither are privileged.

Document No. 14 (RM 16) is a February 17, 2010 email from Jacobs to Rahimian and Angelo referring to Angelo's draft PSA (Doc. No. 15) (RM 17-18), with a copy to Rigot, Harson and Leibson.  In the email, Jacobs refers to information regarding the manufacturing of the closures needed to render the PSA technically complete and accurate.  As the email provides unprivileged factual information and information related

to preparation of the PSA, as a public business communication, it is also thereby rendered non-confidential, and thus outside the privilege.

Document No. 16 (RM 19) is a further email, attaching a draft PSA (Doc. No. 17) (RM 21-22), from Jacobs to Rahimian and Angelo explaining that his suggestion that customer claims regarding failure of any closures be explicitly directed to Defendants was to be deleted from the proposed text of the PSA (RM 19) because of Rigot's expressed reservations about the suggestion.   No legal basis for Rigot's reservation was expressed in this email or in any other documents listed in Plaintiff's privilege log; nor is there any indication in the record, including the Privilege Log, that Rigot's position on Jacobs's proposal took the form of a paper document or email.   The email also refers to the same technical information regarding the closures needed by recipients of the PSA alluded to in Doc. No. 14, Discussion, *supra*, at 61-62, and is, thus, not privileged.

Document No. 18 (RM 22) is another Jacobs email including proposed stylistic changes to the attached draft PSA (Doc. No. 19) (RM 23-24).   No legal advice is provided nor are the proposed changes of a substantive legal character.   As the changes relate to the drafting of the PSA, including the subject of the email – a document intended to be published to third-parties and one reflecting a business subject-matter – Jacobs's changes are not intended as confidential legal advice and, as such, neither document is privileged.

Document No. 20 (RM 25-26) is a February 25, 2010 email from Angelo to Michelle Kristoff, one of Plaintiff's marketing employees, not further identified by Plaintiff, ("Kristoff") involved in publishing the PSA, describing problems in obtaining technical information regarding the closures.   Copies of the email were also sent to Ashley Lusk

and Rodney Hobbs, who are not further identified.  As it relates to preparation of the PSA, it was not intended as confidential, does not request legal advice, and is, accordingly, not privileged.

Doc. No. 21 (RM 27) is a February 26, 2010 email from Angelo to Sparkman, Michael Chiles ("Chiles"), another of Plaintiff's employees, not further identified by Plaintiff involved in issuing the PSA, Rigot, Jacobs, and Harson, transmitting a revised draft of the PSA (Doc. No. 22) (RM 28-29) describing various technical data changes, e.g., removing "heat" numbers not used by Modco, a major distributor for the affected 6-inch closures, regarding the Off-Specification Closures discussed in the PSA, adding details of how customers may request replacement of affected closures, and requesting comments from the email addressees on the changes.  As neither the correct "heat" numbers for the affected closures nor the replacement procedures reflect seeking or providing legal advice or services by Angelo, and are intended for the information and business use of third-parties to facilitate potential inspections by users of the closures as stated in the PSA following receipt of the PSA, the email is not privileged.

Doc. No. 23 (RM 31) is a February 26, 2010 email from Jacobs to Angelo questioning whether Plaintiff's standard product warranties should be applicable to any closures replaced by Plaintiff at a customer's request in response to Plaintiff's offer to do so in paragraph 5(e) of the PSA, proposed language which was deleted from the final version of the PSA.  As the PSA, including this provision, was concededly the result of a business decision and the information regarding warranties was intended for public information, Jacobs's question to Angelo, i.e., whether Plaintiff intended in the PSA that any replacement closures requested by a customer of the affected closures be subject

to Plaintiff's standard terms and warranties, was directed to a business, not a legal, consideration, and one intended by Plaintiff for public awareness.  Although the PSA was modified to exclude subjecting replacements to Plaintiff's standard warranties, Jacobs's email does not indicate it was intended to constitute legal rather than business advice.  Nothing in the record indicates Plaintiff requested legal advice on this issue, and Plaintiff does not argue otherwise.  As such, the email is not privileged.

Doc. No. 24 (RM 31) is a February 26, 2010 email from Angelo to Sparkman transmitting an amended version of the PSA incorporating Jacobs's suggested deletions of the PSA's reference to Plaintiff's standard terms.  Angelo also requests Sparkman's opinion on Jacobs's suggestion that the PSA stress Defendants' responsibility as to the defective closures.  As the revisions were not intended to remain confidential, related to Plaintiff's business decision to issue the PSA without offering warranties for replacement closures, are not directed to Plaintiff's attorneys, and do not seek or reflect legal advice, the email is not privileged.

Doc. No. 25 (RM 30) is a February 27, 2010 email to Angelo from Sparkman suggesting a "stronger" statement that Defendants are responsible for any manufacturing defects in the closures.  As this communication between non-legal corporate personnel was, when made, intended for third-parties, *i.e.*, Plaintiff's customers and users of the affected closures, it was not directed to Plaintiff's attorneys, does not seek or reflect legal advice, and it is not privileged.

Doc. No. 26 (RM 30) is a February 27, 2010 email from Angelo to Rigot, Jacobs, and Harson seeking comments on the first part of proposed paragraph 5 of the draft PSA (RM 29) reminding customers of Defendants' responsibility for the defective

closures and stating Plaintiff's replacement offer.  The communication relates to business information intended for third-parties – Plaintiff's customers and users of the affected closures – is not directed to an attorney for the purpose of obtaining legal advice and is, therefore, not privileged.

Doc. No. 27 (RM 30) is a March 1, 2010 email to Angelo from Jacobs reiterating Jacobs's reservations about extending Plaintiff's standard terms, including warranties, to any replacement closures as expressed in the latest draft PSA.  As with Doc. No. 23, the email relates to a communication intended for third-parties, raises a question of a business nature, does not provide legal advice, and is, therefore, also not privileged.

Doc. No. 28 (RM 25) is a March 1, 2010 email from Kristoff to Angelo and Chiles requesting a status report on the drafting of the PSA.  As it relates to the PSA's intended publication to third-parties it does not qualify as a confidential communication, is not directed to counsel, does not request legal advice or services, and therefore, the email is not privileged.

Doc. No. 29 (RM 33) is a March 1, 2010 email from Angelo to Sparkman and Kristoff attaching the final version of the PSA (Doc. No. 30) (RM 34-35) prior to its publication.  As this email is a document prepared and intended to facilitate publication of the PSA to third-parties, it is not a confidential communication seeking legal advice or services and, therefore, is not privileged.

Doc. No. 30 (RM 34-35) is the final version of the PSA, a document intended for third-parties, *i.e.*, Plaintiff's customers, fabricators, distributors, and pipe-line companies, including those who may then have affected closures installed on their respective systems, and is, therefore, not privileged.

Doc. No. 31 is a handwritten note, dated March 1, 2010, written on a copy of the final version of the PSA, from Angelo to Sparkman and Kristoff, non-lawyers, forwarding a copy of the PSA to Sparkman and Kristoff.  As it is a communication relating to publication of the PSA, it was not intended as a confidential communication to counsel, seeks no legal advice, and, therefore, is not privileged.

**5.    Confidentiality in the Documents Was Not Maintained**.

As noted, Facts, *supra*, at 8, Discussion, *supra*, at 56, n. 13, thirteen of the documents at issue (Doc. Nos. 3-7, 9, 20, 21, 24, 26, 28, 29, 31) were sent to six of Plaintiff's employees (Chiles, Day, Hobbs, Kristoff, Lusk and Sparkman) whose status as policy-makers or persons within Plaintiff's corporate organization with need-to-know of the asserted privileged communications Plaintiff has failed to establish as is its burden. *See Scholtisek v. Eldre Corporation*, 441 F.Supp.2d 459, 464-65 (W.D.N.Y. 2006) (corporate party's failure to establish that confidential status of communication was maintained by limited receipt of employees in policy-making role destroys privilege (citing caselaw)).  *See also Dolin, Thomas & Solomon LLP v. United States Department of Labor*, 719 F.Supp.2d at 245, 253-54 (W.D.N.Y. 2010) (providing confidential and privileged information to persons within an organization not shown to have a need to know such information waives privilege (citing *Coastal States Gas Corporation v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980))); *Allied Irish Banks, P.L.C. v. Bank of America, N.A.*, 252 F.R.D. 163, 169 (S.D.N.Y. 2008) (corporation must maintain privilege by "limiting dissemination only to employees with need to know." (citing and quoting *Bank of New York v. Meridien Biao Tanz Ltd.*, 1996 WL 474177, *2 (S.D.N.Y. Aug. 21, 1996) (citing 2 Jack B. Weinstein & Margaret A. Berger, WEINSTEIN'S EVIDENCE, ¶

503(b)[04] at 503-50 (1988)))).  Here, Plaintiff fails to explain how Chiles, Day, Hobbs,

Kristoff, Lusk or Sparkman served as policy-makers, during the February 10, 2010

through March 1, 2010 period within Plaintiff's corporate organization sufficient to

establish any had a need-to-know of the privileged nature of the disputed

communications. Plaintiff's contention that disseminating the information to all such

employees retained the privilege because they were "few" in number and were "directly

involved with the Public Safety Notice," Plaintiff's Opposition at 9, amounting to an *ipse

dixit*, is insufficient to satisfy this burden.  Accordingly, as to each document received by

any of these employees, Plaintiff has failed to demonstrate the privilege, if any, was

maintained and thus not waived.

**6.    Subject-Matter Waiver**.

Even if any of the documents listed in Plaintiff's privilege log were, as Plaintiff

maintains, entitled to protection from discovery under the privilege, it is also fundamental

that voluntary disclosure by or on behalf of a party during judicial proceedings may waive

the privilege as to the disclosed information as well as all the otherwise privileged

information relating to the same subject-matter of the disclosed information.  *See von

Bulow*, 828 F.2d at 101-02.  "[T]estimony as to part of a privileged communication, in

fairness, requires production of the remainder."  *von Bulow*, 828 F.2d at 102 (citing 1

MCCORMICK ON EVIDENCE §93 at 194-95 (2d ed. 1972)).  *See also* 5 MCCORMICK ON

EVIDENCE § 93 at 422 (Kenneth S. Broun 6th ed. 2006) (when the client-witness "testifies

to the privileged communications, in part, this is a waiver as to the remainder of the

privileged consultation or consultations about the same subject." (citing cases)).  Such

implied, or subject-matter, waivers of the attorney-client privilege are properly found by

courts where voluntary disclosure of confidential client-attorney communications "involve[ ] material issues raised by a client's assertions during the course of a judicial proceeding." *von Bulow*, 828 F.2d at 102.  Subject-matter waiver applies where considerations of fairness should allow the "attacking party to reach all privileged conversations regarding a particular subject once one privileged conversation on that topic has been disclosed," *id.* at 102-03, in order to avoid prejudice to the adversary party and "distortion of the judicial process" that may result from selective disclosure.  *Id.* at 101.  *See also* Fed.R.Evid. 502(a) ("Rule 502(a)") (waiver extends to undisclosed information if waiver is intentional, the disclosed and undisclosed information concern same subject matter, and such information should in fairness be considered together).[14] *See also United States v. Treacy*, 2009 WL 812033, *3 (S.D.N.Y. Mar. 24, 2009) (Rule 502(a) allows finding of subject-matter waiver of attorney-client privilege "in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary" (quoting Advisory Note to Fed.R.Evid. 502(a))).  "'Whether fairness requires disclosure . . . [is] decided . . . on a case-by-case basis . . . depen[ding] on the specific context in which the privilege is asserted.'" *In re County of Erie*, 546 F.3d at 229 (citing and quoting *In re Grand Jury Proceeding*, 219 F.3d 175, 183 (2d Cir. 2000)).  Plaintiff does not contest Rigot's disclosures were voluntary and thus intentional.  Nor does Plaintiff contest that as Plaintiff's Rule 30(b)(6) witness, Rigot's testimony qualifies as a waiver by Plaintiff.  *von Bulow*, 828 F.2d at 101 ("attorney's voluntary disclosures remain

---

[14]   Fed.R.Evid. 502(a) was enacted September 19, 2008 and is applicable, if just and practicable, to pending actions as of such date.  Attorney-Client Privilege and Work Product; Limitations on Waiver, Pub.L. No. 110-322 § 1(c), 122 Stat. 35-38 (2008).  The parties have not addressed the applicability of Rule 502(a).

privileged unless impliedly authorized by client" (citing 8 J. Wigmore, EVIDENCE, § 2325 (McNaughton rev. ed. 1961)).

Here, assuming (despite Plaintiff's concession that the discussions at the February 10, 2010 meeting were not privileged) that the discussions were privileged, as Defendants contend, an examination of Rigot's deposition reveals that the subject-matter of that meeting – the need for preparation and issuance of the PSA advising recipients of Plaintiff's opinion of potential risks associated with all of the affected closures and Defendants' failure to accept responsibility for such closures –  was fully described by Rigot without asserting the privilege.  September 15, 2010 Rigot Deposition, Marino Declaration, Exh. G at 19.  Specifically, in response to Defendants' questioning, Rigot described Rahimian's opinion expressed at the meeting, that because the instant litigation had not concluded, Plaintiff should consider issuing a public statement to users of the Off-Specification Closures, distributors, fabricators and the pipe line industry, warning of the possibility of a failure of the affected closures and the potential for resulting property damage and physical harm.  *Id.* at 21-23, 25.  Rigot also revealed that the decision to issue the PSA was not based on any independent technical or engineering information, but rather, was based on the opinions of Plaintiff executives, Angelo and Rahimian, who are engineers.  *Id.* at 28-29.  Plaintiff conceded this same fact at oral argument by agreeing that "no new science" influenced Plaintiff's decision to issue the PSA. Transcript of Oral Argument held November 15, 2010 (Doc. No. 323) at 76.  Rigot also testified that Plaintiff's attorneys who participated in the meeting commented on Rahimian's question regarding the need to communicate with users regarding the closures; however, Rigot was unable to recall specifically what the

attorneys stated, but that the "consensus" of the meeting was that such communication should be made.  September 15, 2010 Rigot Deposition, Marino Declaration Exh. G at 22-23, 34.

Thus, while Plaintiff's contention that Rigot's disclosure of the purpose of the meeting as well as the rationale for issuance of the PSA did not waive any attorney-client privilege that may have attached to the later discussions and drafting leading to the PSA, such testimony undisputedly revealed, during the instant proceedings, the subject-matter of the draft PSA including the rationale for its issuance upon which subsequent comments by counsel and Plaintiff's executives who assisted in drafting the PSA were based.  *See Robbins-Myers, Inc. v. J.M. Huber Corporation*, 2009 WL 909627, *1 (W.D.N.Y. Mar. 31, 2007) (deposition testimony of plaintiff's senior officers, including Rigot, regarding subject-matter of undisclosed disputed pre-acquisition documents relating to Off-Specification Closures waived attorney-client privilege in such documents (citing *Bowne of New York City, Inc. v. AmBase Corporation*, 150 F.R.D. 465, 479 (S.D.N.Y. 1993) (subject-matter waiver of privilege occurs where holder of privilege discloses a significant part of the matter of communication) (citing authorities)))); *Alpex Computer Corp. v. Nintendo Co.,* Ltd., 1994 WL 330381, *2 (S.D.N.Y. July 11, 1994) (waiver as to undisclosed material related to testimony where material "necessary and proper to evaluation of it [the testimony]").  *See also Ratliff v. Davis Polk & Wardwell,* 354 F.3d 165, 170 n. 5 (2d Cir. 2003) (holding any privilege in documents sent to law firm for review lost where client authorized documents to be submitted to government agency (citing *In re Grand Jury Proceedings*, 219 F.2d 175, 184 (2d Cir. 2000) ("[w]here a corporation has disseminated information to the public

that reveals parts of privileged communications or relies on privileged reports, courts have found the privilege waived"))).  Because the discussions at the meeting and the decision of the participants to issue the PSA were integral to the subsequent drafting of the PSA by the participants, including their related communications, which followed immediately thereafter, Rigot's plenary discussion of the decision to issue the PSA and disclosure of Plaintiff's counsel's involvement in the subsequent drafting process constitutes an intentional waiver of any privilege that could have attached to counsel's involvement in such drafting as evidenced by the documents listed in the Privilege Log. Plaintiff's general assertion that the meeting and drafting activities are separate communications between Plaintiff and counsel with differing purposes, Plaintiff's Opposition at 10 (testimony regarding whether to issue PSA "has nothing to do with the subsequent process of actually drafting [the PSA]"). fails to meet Plaintiff's burden to establish the latter communications were privileged and that Rigot's testimony did not constitute a waiver.  Thus, based on Rigot's voluntary deposition disclosures and Plaintiff's publication of the PSA, which counsel assisted in preparing, the court finds Plaintiff effected a subject-matter waiver in all of the disputed documents listed in the Privilege Log, even assuming Plaintiff had established such documents were created with the requisite intent of initial and sustained confidentiality and for the purpose of obtaining legal advice and assistance as Plaintiff contends.

Specifically, contrary to Plaintiff's assertion that the February 10, 2010 business meeting constituted activity separate from the subsequent drafting process activity to which the privilege applied without any disclosure by Rigot and thus without waiver, the facts as revealed in Plaintiff's papers establish that Plaintiff's decision as to the PSA's

content and issuance as well as its actual drafting resulted from a continuous process of substantive discussion among Plaintiff's executives and attorneys who participated in the February 10, 2010 meeting, starting with the meeting and ending with the March 1, 2010 publication of the PSA, and its drafting by those participants which included both Plaintiff's executives and attorneys – particularly Angelo, Harson, Jacobs, Rahimian, and Rigot.  For instance, immediately following the conclusion of the meeting on February 10, 2010, Rahimian directed Harson to prepare a list of potential frequently asked questions about risks Plaintiff attributed to the closures to be announced by the PSA and suggested answers, as well as the expected use of the "lunch and learn seminars" to further explain Plaintiff's position about the PSA's implicit recall.  (Doc. No. 3) (RM 6). There is no indication in Rahimian's communication that Rahimian sought Harson's legal advice about the legal aspects or desirability of issuing the PSA in relation to Plaintiff's position in the present litigation; rather, Rahimian directed Harson to prepare factual information about matters to be discussed in the PSA and expected follow-up actions of a non-legal nature by Plaintiff and its customers.  Additionally, Angelo prepared, at Rahimian's direction, an initial draft of the PSA and circulated it six days later to the meeting participants for comments without seeking legal advice regarding the PSA itself from any of the attorneys who attended the meeting and to whom the draft was sent, but rather as an implementation of the consensus decision reached at the meeting by the participants.  Immediately following receipt of Angelo's initial draft, Rahimian, on February 17, 2010, offered his changes to Angelo, Jacobs and Sparkman – who did not attend the meeting – and suggested to them that Sparkman's changes to the PSA be considered.  (RM 10).  Based on the court's review of the documents generated after the

meeting at no time did Angelo, Rahimian or Sparkman, or any other of Plaintiff's employees who received the emails, seek substantive or procedural legal advice regarding the draft PSA.

Thus, from the date the meeting was conducted until the PSA was published, the actions and related discussions of the participants in the meeting in preparation of the PSA, and other Plaintiff's employees, constituted a single course of conduct comprised of a series of closely inter-related discussions leading to the final draft and publication of the PSA, a continuous process more akin to a drafting exercise by a committee.  This finding is supported by the fact that the main participants, all but one of whom (Sparkman) were also participants in the February 10, 2010 meeting which launched the process, involving the drafting of the PSA, completed their work over a period of 11 days after the initial draft was tendered for review by Angelo.[15]  Accordingly, there is no merit in Plaintiff's contention that while the meeting was an unprivileged business conference, the subsequent actions and communication involving Plaintiff's counsel were distinct from the meeting so that Rigot's intentional disclosures about the substance of the conversations at the meeting could not operate as a waiver of the privilege regarding the subsequent drafting activity even assuming such later discussions and drafting were, as Plaintiff contends, privileged.  Therefore, alternatively, Rigot's deposition testimony effected a subject-matter waiver of the post-February 10, 2010 discussions and drafting process by the participants which created the PSA.  Moreover, such waiver is necessary

---

[15]  The PSA drafting process distinguishes it from the more typical scenario where business executives formulate a decision, *e.g.*, to initiate litigation or an acquisition, and engage counsel to conduct an investigation and prepare necessary legal papers or opinions.

to prevent a fundamental unfairness to Defendants as required for a finding of subject-matter waiver under *von Bulow* and Fed.R.Evid. 502(a).

Plaintiff's fraud claims against Defendants are predicated on the allegations that Defendants' failure to disclose fully the nature and extent of the Off-Specification Closures manufactured and distributed by Defendants prior to Plaintiff's purchase of FCE was a material omission or misrepresentation.  Amended Complaint ¶¶ 30 ("material to the business of FCE"), 45 ("failure to disclose to R&M material facts necessary . . . to make [Defendants'] statements . . .  not deceptive and misleading"), 59 (Defendants violated Texas law by sale of a security by an "untrue statement of material fact or an omission to state a material fact."); Defendants' Supplemental Memorandum at 9 (Plaintiff's failure to supplement deprived Defendants of discovery relevant to Plaintiff's assertion Defendants' misrepresentations and omissions were material). Although Plaintiffs did conduct in 2000 a limited recall of the so-called high-pressure 4-inch Off-Specification Closures following the FCE acquisition in 1997, since instituting this action in 2001, Plaintiff has not, until the PSA, taken further steps to communicate with users of the closure that the affected closures may pose serious risks of failure capable of causing damage or harm.  Allowing Plaintiffs to reveal that Rahimian, without the benefit of intervening engineering or scientific opinion raising the possibility of imminent failure of the closures, believed communications with users warning of such risks at that time were necessary to ameliorate such risks, paints an incomplete picture of Plaintiff's actual motives in issuing the PSA.  Defendants could, with the benefit of the post-meeting documents withheld by Plaintiff as privileged (if not further deposition testimony of Angelo, Rahimian, Rigot, and Sparkman), demonstrate that Plaintiff's

decision to issue the PSA, rather than to warn users of a genuine risk of closure failure and to take immediate remedial action, was motivated primarily as a litigating tactic to deflect Defendants' anticipated attack on Plaintiff's assertion that the closure problem was material to Plaintiff's decision to purchase FCE lacks substance because Plaintiff, over nearly a 10-year period, saw no need to warn users about the 9,000 unrecalled Off-Specification Closures until 2010.  Such documents and potential testimony could also assist Defendants in undermining the credibility of Plaintiff's materiality claims by showing that rather than a desire to warn of actual risk of closure failure, Plaintiff's real purpose was to foment claims against Defendants by users in order to pressure Defendants to settle the case on more favorable terms to Plaintiff or dilute Defendants' resources in defending a plethora of new lawsuits by such potential claimants, thus providing a basis for inferring Plaintiff's acknowledgment of the weakness of its claims in this action.  Additionally, a review of the email communications at issue, particularly those between Rahimian and Jacobs, as well as Rigot's reservations, undisclosed, on this subject which apparently were communicated to Jacobs, and probably other participants in the drafting process, could support arguing that Plaintiff's motive was primarily directed to antagonizing Defendants rather than warning customers and users of actual risks from failure of the affected closures.

Importantly, Plaintiff has not rejected the possibility that should Defendants argue, as Defendants have, that Plaintiff's materiality claims are questionable in light of Plaintiff's failure to promptly pursue, since 2000, additional recalls of all the affected closures or issue warnings about their risk of failure, Plaintiff would use the PSA to rebut such attack.  As Defendants stated in support of Defendants' motion, "[Plaintiff]

disclosed [the PSA] voluntarily, presumably because they hope to use it in support of their claims at trial." Defendants' Supplemental Memorandum at 2. Plaintiff has not denied Defendants' assertion. Accordingly, Defendants will be unfairly prejudiced in countering the likelihood of such rebuttal, as well as Plaintiff's actual motives in issuing the PSA, if full disclosure of the genesis for such rebuttal material is not provided. Thus, Plaintiff's expected use of disclosed (Rigot's deposition testimony regarding the meeting resulting in, Plaintiff's decision to prepare and issue the PSA, as well as the actual publication of the text of the PSA itself) and undisclosed (the subsequent drafting activity and discussions of the PSA) assertedly privileged communications should in fairness be considered together by the trier of fact, warranting a finding of a subject-matter waiver of the Jacobs Outline, Angelo's notes and emails relating to the drafting of the PSA. *See von Bulow*, 828 F.2d at 10 (subject-matter necessary to prevent "distortion of judicial process" resulting from partial disclosure); *Treacy*, 2009 WL 812033, *3 (subject-matter waiver warranted "to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary" (quoting Advisory Note to Rule 502(a))); *Alpex Computer Corp.*, 1994 WL 330381, *2 (disclosure of related material for "necessary and proper evaluation of [disclosed testimony]"). *Cf. Seyler v. T-Systems North America, Inc.*, 2011 WL 196920, *3 (S.D.N.Y. Jan. 21, 2011) (citing *Eden Isle Marina, Inc. v. United States*, 89 Fed.Cl. 280, 521 (2009) (no subject-matter waiver absent showing that defendant's disclosures had "strategic value" or "adversely impacted plaintiff's [the attacking party] ability to prosecute its case.")).

　　　Here, evidence of Plaintiff's decision to mount an implicit recall of the Off-

Specification Closures[16] by issuing the PSA regarding the remaining 9,000 affected closures, along with its only formal and limited prior recall in 2000, will serve to bolster Plaintiff's claims that Defendants' fraud was material and, with equal emphasis, advising users of Defendants' responsibility for claims related to the affected closures, constitutes a "strategic" use of the disclosed and undisclosed information at issue that will, unless disclosed, "prejudice" Defendants' ability to establish its defense based on the lack of materiality of Defendants' alleged omissions or misrepresentations in connection with Defendants' sale of FCE to Plaintiff.  As well, Defendants' ability to attack the credibility of Plaintiff's assertions regarding the risk of failure Plaintiff associates with the closures will be impaired.  For example, a trier of fact may reasonably question whether Plaintiff's salient effort in drafting the PSA to shift public blame for any damage or inconvenience caused by the affected closures to Defendants dilutes Plaintiff's stated belief that the affected closures remaining in use pose a serious risk of failure requiring immediate remedial action.

Finally, even if Rigot's deposition disclosures regarding the Plaintiff's decision to issue the PSA were deemed insufficient to trigger a subject-matter waiver of the documents Plaintiff asserts as privileged despite the deposition testimony, Plaintiff's publication of the PSA itself is a sufficient reason to find such waiver applies to the documents.  In *von Bulow*, the court found the partial disclosures of privileged attorney-client communications published in a book did not effect a subject-matter waiver of the

---

[16]  Plaintiff refers to the Q&R as the "Yale Closure Recall Questions and Responses," Plaintiff's Exh. 10 ¶ 4, and Plaintiff's hot-line log refers to the log as the Recall Hotline Log.  Marino Declaration Exh. M.  Plaintiff asserts no privilege in these disclosed documents.

undisclosed attorney-client communications because the publication was "extra-judicial," the disclosed information was "made outside a litigation context" by, for example, being "placed at issue during litigation," *von Bulow*, 828 F.2d at 101-02, and there was no demonstration the adversary party was prejudicial in actual litigation. *Id.* at 103.  Here, the decision to issue the PSA was prompted, in part, by Plaintiff's realization that the instant litigation would yield an earlier determination of Defendants' liability was erroneous.  Marino Declaration Exh. G at 19, 22 (Rigot's testimony that Rahimian believed the case had "drag[ged]" on and Defendants had "continued to do nothing about the closure products they sold" requiring Plaintiff to give notice to its customers about the Off-Specification Closures).  Thus, Plaintiff's preparation and issuance of the PSA occurred during the progress of the instant litigation, if not prompted by the process of litigation itself, enabling Plaintiff to rebut any contention by Defendants that Plaintiff's extended silence (since the 2000 limited recall) constituted evidence of Plaintiff's lack of belief that the remaining unrecalled closures continued to create a serious risk of failure. By issuing the PSA in order to bolster Plaintiff's position that all the closures presented a serious and continuing risk of failure, Plaintiff has placed in issue the credibility of Plaintiff's belief as to the continued existence of such risk and the related issue of the materiality of Defendants' alleged omission and misrepresentations regarding the extent of the affected closures as a portion of the FCE assets sold to Plaintiff.  Refusing Defendants any review and use of the documents as a means to obtain a full understanding of the actual reasons for the substance and issuance of the PSA will undermine Defendants' ability to effectively overcome benefit Plaintiff will inevitably gain in this litigation from its belated but nevertheless strategic issuance and anticipate use of

the PSA in support of its case.  Accordingly, applying the holding and reasoning in *von Bulow* to these facts, the court finds that by issuing the PSA Plaintiff effected a subject-matter waiver of any privilege conceivably applicable to the documents listed in the Privilege Log.

Thus, the court finds that Rigot's disclosures were intentional, they occurred during the instant judicial proceedings, the disclosed communications among the February 10, 2010 meeting participants and the subsequent, undisclosed, communications and information relating to the drafting and issuance of the PSA pertain to the same subject matter disclosed by Plaintiff through Rigot's voluntary testimony regarding the meeting which extended to the post-meeting drafting and issuance of the PSA, and that considerations of fairness dictate that the undisclosed assertedly privileged communications and information relating to the actual drafting and issuance of the PSA should be disclosed to Defendants.  *See* Fed.R.Evid. 502(A)(1) - (3).

### 7.    <u>Waiver Based on Plaintiff's Failure to Serve a Timely Privilege Log</u>.

When a party withholds relevant information that is discoverable, pursuant to Fed.R.Civ.P. 26(b)(1), on the grounds of privilege, a party is obligated to promptly provide the adverse party with notice of the claimed privilege by preparing and serving a privilege log sufficiently describing the withheld information to enable the adverse party to assess the validity of the asserted privilege.  Fed.R.Civ.P. 26(b)(5((A); *see also* W.D.N.Y. Local R.Civ.P. 26(f) (requiring privilege log be furnished "<u>at</u> <u>the</u> <u>time</u> <u>of</u> <u>the</u> <u>response</u> [to discovery]").  A failure to comply with this requirement results in a waiver of the asserted privilege in the withheld information.  *See United States v. Construction Products Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996) (failure to provide adequately

detailed court-ordered privilege log waives privilege); *Bove v. The Allied Group*, 2004

WL 5902631, *1 (W.D.N.Y. Oct. 28, 2004 (failure to provide privilege log complying with

local rule waives privilege); *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, 2000 WL

1538003, *3 n. 1 (S.D.N.Y. Oct. 17, 2000) (citing *PKFinans Int'l. Corp. v. IBJ Schroder

Leasing Corp.*, 1996 WL 525862, *3 (S.D.N.Y. Sep't. 17, 1996) ("party's failure to

produce [privilege] log results in a waiver of any privilege that might otherwise be

asserted" (citing caselaw))).

Here, as discussed, Discussion, *supra*, at 18-38, Plaintiff's obligation to provide

the PSA and related documents as a supplemental response to Defendants' requests

accrued not later than 30 days after the publication of the PSA on or about March 1,

2010.  *See PKFinans Int'l. Corp.*, 1996 WL 525862, *3 (privilege log due 30 days after

required discovery responses).  Their existence, however, was not revealed to

Defendants until the September 15, 2010 Rigot deposition.  Marino Declaration Exh. G

at 19-33.  Because Plaintiff erroneously perceived that such documents were not

responsive to any discovery request issued by Defendants, *i.e.*, Defendants' Requests,

calling for production of documents relating to Plaintiff's communications with its

customers regarding the Off-Specification Closures, *id.* at 33,[17] and thus failed to provide

such documents to Defendants, it was necessary for Defendants to demand their

---

[17]  Sager:      ". . . your obligation to produce those documents has absolutely nothing to do with
the deposition [of Rigot] today or tomorrow.  It has to do with a clear ongoing
obligation to provide documents that are responsive to [Defendants'] discovery
requests."

Jacobs:      "Well, I don't believe that there are any such discovery requests."

Marino Declaration, Exh. G at 33.

production in writing on September 21, 2010.  Plaintiff's Opposition Exh. G.  Thus, it is

evident that Plaintiff had no intention to supplement its response to Defendants'

Requests to reveal the existence of the PSA and related documents as to which Plaintiff

belatedly decided to assert an attorney-client privilege, nearly seven months after the

PSA was published on March 1, 2010, until confronted by Defendants with this failure

during the Rigot deposition.  Marino Declaration Exh. I (September 20, 2010 Letter from

Matthew E. Leibson, Esq. to David S. Sager, Esq. denying obligation to supplement

Plaintiff's responses and asserting privilege).

Accordingly, the court finds that, contrary to Plaintiff's assertion, its duty to

supplement arose under Rule 26(e) not later than 30 days following publication of the

PSA on March 1, 2010, when Plaintiff learned, by virtue of the Plaintiff's own creation of

the documents, that its earlier response to Defendants' Request was rendered materially

incorrect and incomplete requiring service of additional documents Plaintiff claims as

privileged relating to the PSA under Rule 26(e)(1)(A), and that based on Plaintiff's

undisputed failure to timely supplement and serve the required privilege log asserting a

privilege with respect to the documents relating to the preparation of the PSA, which

then existed, Plaintiff has also waived any privilege in such documents on this ground.

**8**.   **Plaintiff's Cases Are Inapposite.**

Nor are the cases Plaintiff relies upon apposite, Plaintiff's Opposition at 9-10.  In

*In re County of Erie*, 546 F.3d 222 (2d Cir. 2008), the court held that the record did not

support finding that defendant had effected an implied waiver of the privilege based on

the at-issue theory where there was no showing that defendant's employees had relied

on advice of counsel provided in emails in formulating policy regarding strip-searches at

the county jail.  *Id.* at 229.  Here, Defendants do not contend that Plaintiff impliedly waived any privilege based on the at-issue doctrine.  While Defendants assert that the privilege "cannot be used as both sword and shield," Defendants' Supplemental Memorandum at 8 (citing cases), this proposition is offered in support of Defendants' contention that no privilege attached to the follow-up communications implementing the "business matters" discussed at the February 10, 2010 meeting.  *Id.* (citing *Reino de Espana*, 2005 WL 3455782 (S.D.N.Y. Dec. 14, 2005)).  In any event, Plaintiff does not contend that in drafting or issuing the PSA, Plaintiff's employees relied on advice of counsel, assuming such advice had been rendered.  As relied upon by Plaintiff, *In re County of Erie, supra*, is therefore inapposite.

In *Scholtisek v. Eldre Corp.*, 441 F.Supp.2d 459 (W.D.N.Y. 2006), cited by Plaintiff to support the retention of the privilege in the drafting emails relating to the PSA received by other of Plaintiff's employees who did not participate directly in drafting the PSA, Plaintiff's Opposition at 9, the court found that disclosure of defendant's attorney's opinion on defendant's corporate pay calculation policy waived the privilege where the deposed employee receiving and testifying concerning  the disclosure from a senior manager had no need to know such opinion of counsel.  *Id.* at 464 (citing authorities). Thus, the court found that defendant had failed to maintain the confidential nature of its attorney's advice subjecting such advice to loss of the privilege in the disclosed advice. *Id.*  Here, the primary issue is not whether Plaintiff's executives receiving information and advice from the attorneys involved during the drafting of the PSA were entitled to receive such assistance in order to maintain the privilege, but whether the communications to or from the attorneys who were involved were intended to constitute confidential

communications and legal advice.  Moreover, that Plaintiff's other non-lawyer personnel, such as Chiles, Day, Hobbs, Kristoff, Lusk, and Sparkman, were privy to the emails and drafting process, without any showing by Plaintiff, as was its burden, that such involvement was necessary to their function within Plaintiff's corporate organization is a further ground for finding that any privilege in the communications was lost for failure to maintain confidentiality.  *See Scholtisek*, 441 F.Supp.2d at 464 (failure by party with burden to demonstrate existence of privilege to show corporate employees with access to assertedly privileged documents on need-to-know basis, *e.g.*, as policy makers, defeats privilege).  That these individuals, including Sparkman, lack such need-to-know status is consistent with the fact that none participated in the February 10, 2010 meeting at which it was decided to prepare and publish the PSA.  Marino Declaration Exh. E at 20.  Based on *Scholtisek*, Plaintiff's involvement of Chiles, Day, Hobbs, Kristoff, Lusk, and Sparkman in the PSA drafting process negates any privilege that may have attached to the withheld documents received by them.  Accordingly, the holding in *Scholtisek* does not support Plaintiff's position on the issue of whether Plaintiff maintained the requisite confidentiality of the PSA drafting communications.

In *Bristol-Myers Squibb Company v. Rhone-Poulenc Rorer, Inc.*, 1997 WL 801454 (S.D.N.Y. Dec. 31, 1997), the court held that defendant's conceded privilege waiver based on disclosure of a scientific report supportive of defendant's patent claim extended to "potentially adverse documents addressing the same subject matter."  *Id.*, *4.  Thus, rather than supporting Plaintiff's contention that Rigot's disclosures at the February 10, 2010 meeting effected no subject-matter of the privilege Plaintiff contends attached to the withheld documents listed in the Privilege Log, this case tends to support

Defendants' position that such a waiver occurred here.

In *Kirschner v. Klemons*, 2001 WL 1346008 (S.D.N.Y. Oct. 31, 2001) the court found plaintiff had waived the privilege by revealing conversations with counsel regarding the alleged letter but found no subject-matter waiver regarding documents reflecting conversations with other counsel concerning the subject of the propriety of defendant's publishing the fact of professional disciplinary actions in the actionable letter based on defendant's "partial disclosures" of defendant's conversations with a particular attorney regarding the drafting the letter. *Id.*, *4. Here, Rigot's deposition testimony which revealed the scope and substance of the February 10, 2010 meeting, hardly constituted a "partial disclosure" of that subject-matter, and the subsequent communications at issue directly emanated from the meeting with the principal participants. Moreover, by issuing the PSA itself, Plaintiff waived any privilege in the related documents upon which it was based. *Kirschner*, 2001 WL 1346008, *4 (defendant "may seek production of documents relating to . . . letter" containing advice of counsel as disclosed by defendant). Thus, the facts and analysis in *Kirschner, supra*, provide no support to Plaintiff's contention that subject-matter waiver is inapplicable to the PSA drafting process in this case. Instead, if *Kirschner* has any applicability, by comparison, it lends support to the court's finding that both Rigot's testimony and the issuance of the PSA constituted disclosures and waiver sufficiently broad to reach the PSA drafting communications with which they are integrally connected, and that fairness requires disclosure of the documents withheld by Plaintiff based on its assertion of privilege.

In *EEOC v. Johnson & Higgins, Inc.*, 1998 WL 778369 (S.D.N.Y. Nov. 6, 1998)

the court held a subject-matter waiver, which applied to one repudiating affidavit, did not extend to all draft repudiating affidavits absent a showing that the party supported by the repudiating affiant [the EEOC-plaintiff] was likely to affirmatively use the disclosed affidavit and other related draft repudiating affidavits to bolster its case against defendant. *Id.*, *10.  Here, as discussed, Discussion, *supra*, at 46, 74-79, the court has found that Plaintiff will likely gain a tactical advantage in the instant litigation from its issuance of the PSA; therefore, allowing Plaintiff to withhold all related information (the PSA drafting process communications cited in the Privilege Log) tending to undermine Plaintiff's disclosed rationale for such issuance would impose a substantial disadvantage upon Defendants in defending against Plaintiff's claims.  As with *Kirschner, supra, Johnson & Higgins, Inc.,* does not support Plaintiff's position that no subject-matter waiver occurred in this case; rather, the court finds the magistrate judge's analysis in *Johnson & Higgins, Inc.* supports this court's determination on the same issue, that subject-matter waiver applies to the disputed documents, in the instant case.

## C.     Defendants' Request to Reopen Discovery and For Sanctions.

As discussed, Discussion, *supra*, at 18-38, Plaintiff's failure to provide timely supplementation of its responses to Defendants' Requests related to the February 10, 2010 meeting and the drafting and publication of the PSA constituted a violation of Plaintiff's duty to supplement under Rule 26(e).  Additionally, the court has found that none of the documents described in Plaintiff's Privilege Log are privileged.  Discussion, *supra*, at 52-66.  Consequently, Defendants contend, Defendants have had no meaningful opportunity to depose Plaintiff regarding these matters.  Defendants'

Memorandum at 10-12; Defendants' Supplemental Memorandum at 8-9.  Specifically, Defendants point to Rigot's inability to respond fully to questions regarding recently produced documents including details of the production and publication of the PSA, notice to its insurance carrier of its intention to issue the PSA, Rigot's report to Plaintiff's directors that the liability insurer of Berkley Forge, one of the producers of the Off-Specification Closures, will defend Plaintiff in the event of a products liability claim based on the affected closures, Sparkman's knowledge of the extent of Plaintiff's use (or non-use) of the so-called "lunch and learn seminars" with users of the closures to communicate Plaintiff's perceptions of the risk of failure of the closures at that time, Plaintiff's recommendations to such users and customers for preventative measures to be taken, and details regarding the telephone hot-line Plaintiff established under the supervision of Lee to respond to customer inquiries regarding the PSA.  Defendants' Memorandum at 10-12.  As Defendants point out, such evidence is relevant to the core element of materiality of Plaintiff's claims as well as the basis of Plaintiff's damages arising from Defendants' alleged misrepresentations and omissions, Defendants' Memorandum at 9, and Plaintiff does not argue otherwise.

In opposition, Plaintiff asserts Defendants fail to explain why additional deposition testimony may be necessary in relation to the later produced documents, and why Rigot's deposition of September 15-16, 2010 was insufficient.  Plaintiff's Memorandum at 10-11.  Particularly, Plaintiff states that the subject of Plaintiff's awareness of the Berkeley Forge insurer's offer to defend against potential product liability claims arising from a closure failure was covered in previous depositions.  *Id.* at 11.  Plaintiff also contends Defendants have been aware of Sparkman's responsibility for closure issues,

and Plaintiff's use of the lunch and learn seminars regarding product safety issues

based on the 2003 Witte deposition, Plaintiff's Memorandum at 3, and Lee's log of calls

and use of the Q&R on the hot-line, reveal nothing to warrant a deposition of Lee on this

subject. *Id.* at 11-12. In reply, Defendants point out that Plaintiff's belated disclosure of

the PSA and its reliance on "lunch and learn" sessions to address with Plaintiff's

customers Plaintiff's perceptions of risk related to the affected disclosures has deprived

Defendants of a fair opportunity to develop the facts surrounding those activities.

Defendants' Reply Memorandum at 8. For example, Defendants point to Rigot's inability

to explain how the content of the PSA was determined, including blaming Defendants for

the closure problem, and details regarding Plaintiff's customer response to the PSA.[18]

*Id.* Defendants also point out that Witte, who discussed the use of lunch and learn

seminars to promote product safety in his 2003 deposition, contrary to Plaintiff's

implication, in fact was a former Defendants' employee and witness relating Defendants'

use of this customer communication device, not a Plaintiff's witness describing Plaintiff's

use of the technique as Plaintiff implied. Defendants' Reply Memorandum at 5 n. 1.

Plaintiff has not responded to Defendants' representation and the court assumes

Plaintiff has therefore abandoned this contention.

Federal courts have discretion to manage pretrial discovery and to reopen

discovery even when the period for discovery has, pursuant to a scheduling order,

closed where the court finds good cause warrants such an extension or reopening. *See*

---

[18] It is unclear whether Defendants maintain there is cause for a further deposition regarding Plaintiff's awareness of products liability coverage from Berkeley Forge for affected closures given Rigot's prior, February 24, 2004, deposition testimony on this subject, Plaintiff's Opposition, Exh. 21 at 178-79, as the issue is not further mentioned in Defendants' Reply Memorandum. Accordingly, the court finds Defendants have receded on this asserted ground for additional discovery.

*Kate Limited Liability Company v. AT&T Corporation,* 607 F.3d 60, 68 (2d Cir. 2010) (reviewing district court's denial of motion to reopen discovery for abuse of discretion); *Universal Church v. Geltzer*, 463 F.3d 218, 227 n. 6 (2d Cir. 2006) (vacating summary judgment and noting that upon remand to district court to address issue of net worth of alleged insolvent debtor, the district court had discretion of reopen discovery on the issue). *See also Wills v. Amerada Hess Corp*, 379 F.3d 32, 41 (2d. Cir. 2004) ("recognizing the district court's broad discretion to direct and manage the pre-trial discovery process, we also review a district court's discovery ruling for abuse of discretion." (citing *In re Fitch, Inc.*, 330 F.3d 104, 108 (2d Cir. 2003))).   In this instant case, the court granted Defendants an additional 90 days for fact discovery in response to Plaintiff's compliance, following Defendants' successful motions to compel, with prior orders by Order dated June 24, 2010 (Doc. No. 292).   The need for additional discovery in this case arises almost entirely because of Plaintiff's belated disclosures of relevant information responsive to Defendants' Requests as well as the paucity of relevant details regarding the PSA, the Plaintiff's use of "lunch and learn seminars" to implement the PSA, details of customer reactions to the PSA, and Plaintiff's advice to its insurer regarding the PSA, provided by Rigot's deposition conducted September 15-16, 2010.

A careful review of Rigot's deposition, to the extent provided to the court, indicates Rigot gave generalized recollections regarding the February 10, 2010 meeting at which Plaintiff's decision to produce the PSA was reached.   Marino Declaration Exhs. E & G.   For example, in response to Defendants' question regarding the views of the individual participants, Rigot stated, "I would be unable to remember what individuals said.   I remember what the consensus was."   *Id.*, Exh. G at 27.   Further, Rigot was

unable to provide details regarding Plaintiff's use of the "lunch and learn seminars" to implement the "consensus" reached at the meeting regarding the need to advise users of the affected disclosures of potential risks of failure at that time, Exh. G at 30, nor was Rigot able to give details regarding communications to Plaintiff's customers about the PSA, *id.* Exh. E at 28, deferring to Lee or Sparkman for information identifying which of Plaintiff's customers received the PSA.  *Id.* at 28-31.  A comparison of Angelo's initial draft of the PSA and Rigot's deposition testimony also reveals that Defendants have had no discovery on why, if Plaintiff deemed it important that the PSA alert customers at that time to a heightened risk of closure failure, it was also necessary to remind customers in the PSA of Defendants' responsibility, as alleged by Plaintiff in its request for declaratory relief, for the Off-Specification Closure problems and Defendants' past failure to take any similar preventive steps.  Facts, *supra*, at 11; Discussion, *supra*, at 88-99.  Although Sparkman's affidavit (Doc. No. 321-1) avers that no documents were created regarding use of the "lunch and learn" sessions for [Off-Specification] closures or other products," Sparkman Affidavit ¶ 7, the affidavit does not negate that the subject was discussed by Plaintiff's representatives with Plaintiff's customers and users of the affected disclosures both before and, consistent with Rahimian's expectation, Privilege Log Doc. No. 3, after Plaintiff's issuance of the PSA, that additional such sessions were conducted by Plaintiff. Sparkman Affidavit ¶ 4 ("Lunch and learn sessions for closures continue to be held on a periodic basis.").  The substance, if not the details, of exactly what information regarding the affected closures, especially the Plaintiff's belief as to the risk of failure, was conveyed by Plaintiff's representatives to Plaintiff's customers and users at such sessions, as well as the responses of the customers to Plaintiff's representatives, is

relevant to fundamental issues of Defendants' liability, the credibility of Plaintiff's executives in support of allegation that Defendants' omissions and misrepresentations regarding the Off-Specification Closures were material,  the actual extent of Plaintiff's reliance on such alleged omissions and misrepresentations, and Plaintiff's damages arising on Plaintiff's claims.

Additionally, Rigot claimed he was unaware of the rationale for Plaintiff's decision to specifically cast Defendants with responsibility for the Off-Speculation Closures in the PSA.  Marino Declaration, Exh. E at 107.  However, as discussed, Discussion, *supra*, at 62, in a February 17, 2010 email, Jacobs indicated Rigot declined to support inclusion of Jacobs's proposed text in the PSA to refer customers and users of the closures to Defendants for compensation.  (Doc. No. 18) (RM 22).  Rigot's reasons for doing so are not revealed in the documents nor does Plaintiff indicate the form of Rigot's communication.  Such unprivileged communication, as determined by the court, demonstrating Rigot's direct involvement in reviewing the PSA on the issue of whether the PSA should emphasize Defendants' responsibility for the Off-Specification Closures including payment by Defendants of compensation claims promoted by Plaintiff, directly challenges Rigot's credibility that he lacked knowledge of the reason for such emphasis as Defendants' alleged responsibility.  Defendants are therefore entitled to investigate the true extent of Rigot's actual knowledge on this issue.  Thus, the court finds good cause exists warranting an additional period within which Defendants may obtain further discovery through depositions of persons with direct knowledge of these relevant subjects including Angelo, Lee, Rahimian, Rigot, and Sparkman.

Pursuant to Fed.R.Civ.P. 37(b)(2)(A)(ii) and (c), the court could, upon this record,

alternatively preclude Plaintiff from offering evidence in regard to the PSA, based on Plaintiff's failure to comply with Rule 26(e), and thereby obviating the need for any additional discovery on this subject.  *See Schiller v. City of New York*, 2007 WL 735010, *4 (S.D.N.Y. Mar. 12, 2007) (declining to preclude newly discovered evidence in favor of reopening disclosure, including, but not limited to, the taking of a deposition of a key witness, because preclusion would have prevented full legal analysis of important issues).  However, the court finds that limited additional discovery will be the more effective means to avoid any prejudice to Defendants arising from Plaintiff's failure to provide as required by Rule 26(e) earlier discovery on those subjects.  Accordingly, Defendants are granted <u>90 days from the date of this Decision and Order</u> within which to conduct additional depositions of Angelo, Lee, Rahimian, Rigot and Sparkman on these subjects.  Plaintiff shall cooperate fully in the scheduling and conduct of such depositions.  Defendants may also serve further production requests pursuant to Fed.R.Civ.P. 34(a) directly related to any such scheduled deposition.

The record also supports finding that the need for additional depositions to provide the full discovery to which Defendants are entitled stems from Plaintiff's unwarranted failure to timely provide disclosure of the PSA and Privilege Log. Specifically, had Plaintiff complied timely with its duty to supplement its responses to Defendants' Requests prior to Rigot's deposition, Defendants' need to redepose Rigot on several material issues, as permitted by the court, might have been obviated. Therefore, assuming Defendants elect (as consistent with Defendants' request) to redepose Rigot regarding the PSA and its drafting process, including the question of Plaintiff's notice, if any, to its insurer of Plaintiff's intended issuance of the PSA, Plaintiff

shall reimburse Defendants' reasonable expenses and attorneys fees incurred in connection with such redeposition.  *See Crown Castle USA, Inc. v. Fred A. Nudd Corp.*, 2010 WL 4027780,  **4-5 (W.D.N.Y. Oct. 14, 2010) (awarding costs of redepositions necessitated by plaintiff's late document production); *Wiwa v. Royal Dutch Petroleum Co.*, 2009 WL 498088,  **3-4 (S.D.N.Y. Feb. 25, 2009) (costs to redepose witness necessitated by plaintiff's late document production awarded to defendant pursuant to Fed.R.Civ.P. 37).  Plaintiff's failure to communicate with its insurer regarding the PSA is also relevant subject matter thus warranting development through additional deposition testimony by Rigot or other employees of Plaintiff with knowledge as such failure may reasonably suggest Plaintiff's motivation in issuing the PSA was for the purpose of obtaining a tactical advantage in the litigation without regard to any actual belief in the risk of failure associated with the closures thus impairing its insurer's potential subrogation claims, if not Plaintiff's entitlement to a defense and indemnification based on Plaintiff's breach of the duty to cooperate with the insurer in the event of an actual successful damage claim against Plaintiff arising from such closure failure.  Defendants should therefore have an opportunity to redepose Rigot (or other knowledgeable representative of Plaintiff) on this question.

As Plaintiff's violations of Rule 26(e) were not substantially justified, the court also finds that Defendants should be awarded reasonable expenses of Defendants' motion, including attorneys fees, pursuant to Fed.R.Civ.P. 37(c)(1)(A) (expenses of motion in lieu of preclusion may be awarded for violation of Rule 26(e) unless the failure to supplement substantially justified or awarding expenses would be otherwise unjust).  *See Daval Steel Products, a Division of FrancoSteel Corporation v. M/V Fakredine*, 951

F.2d 1351, 1365-67 (2d Cir. 1991) (the efficacy of less severe sanctions, such as awarding the costs of a motion to compel rather than preclusion or dismissal of an action, must be considered).  A failure to provide required discovery is substantially justified where "the information sought is not properly discoverable," because it is, for example, either irrelevant, privileged, or it would be unduly burdensome to provide.  *See Fronseca v. Regan*, 734 F.2d 944, 948 (2d Cir. 1984) (holding dismissal of claim as sanction for failure to respond to discovery request seeking information that was not likely to "shed new light" on claim and thus irrelevant was erroneous).  Here, the withheld information is unquestionably relevant and, as determined by the court material, to Defendants' defense.

In this case, the court's discussion of the text and history of Rule 26(e) demonstrates the duty to supplement arises when a party learns that additional information must be provided to make a prior response materially complete.  Discussion, *supra*, at 25.  That certainly occurred when Plaintiff created and published the PSA.  Nor can Plaintiff rely on the *Kingsway* and *Cassier* opinions, an authority that Rule 26(e) does not cover later-created documents, Discussion, *supra*, at 31-33, to avoid sanctions. The record demonstrates that Plaintiff's failure to supplement was primarily because Plaintiff believed, erroneously, that Defendants' Requests which had been previously served did not cover the PSA and related documents, not because Plaintiff believed it had no duty to supplement its earlier responses to Defendants' Requests under Rule 26(e).  *See* Discussion, *supra*, at 80, n. 17 (In response to Defendants' assertion that the requested PSA documents were responsive to Defendants' Requests, Plaintiff's counsel stated "I don't believe that there are any such discovery requests.").  Thus,

Plaintiff cannot find 'safe-harbor' in either *Kingsway* or *Cassier* as substantial justification for its failure to supplement.  "Conduct is substantially justified if there is a 'genuine dispute' or if 'reasonable people could differ' as to the appropriateness of the contested action." *Underdog Trucking, L.L.C. v. Verizon Services Corporation*, 2011 WL 803025, *5 (S.D.N.Y. Mar. 7, 2011).  Moreover, given that Rule 26(e)'s duty to supplement has consistently been applied to material information known to a party having the duty, it was not reasonable for Plaintiff to refuse supplementation based on the notion that it was reasonably arguable whether the duty attached to the PSA, and the award would not be unjust in these circumstances.  Accordingly, Defendants' requests, pursuant to Fed.R.Civ.P. 37(c)(1)(A), for expenses of the motion including reasonable attorneys fees is GRANTED.

Defendants shall serve their affidavit of expenses relating to any further deposition of Rigot within 10 days following conclusion of such deposition.  Plaintiff may file its response within 10 days thereafter.  Defendants' reply, if any, shall be filed 5 days following Plaintiff's response.  Oral argument shall be at the court's discretion.

Defendant shall serve its affidavit of expenses in connection with Defendants' motion within 10 days of this Decision and Order; Plaintiff shall serve its response within 10 days thereafter.  Defendants' reply, if any, shall be served within five days following Plaintiff's response.  Oral argument will be at the court's discretion.

## CONCLUSION

Based on the foregoing, Defendants' motion and for sanctions (Doc. No. 304) including additional discovery is GRANTED.  Plaintiff shall serve Defendants with copies

of all documents listed in the Privilege Log <u>within 10 days</u> of this Decision and Order.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

Dated: March 21, 2011
      Buffalo, New York